## Case No. 17,106.

### WALLAMET R. T. CO. v. OREGON S. N. CO.

[9 Chi. Leg. News, 73.]

District Court, D. Oregon.    1876.

COLLISION IN FOG—SPEED—SIGNALS—DAMAGES— RULES—EFFECT OF PARDON ON WITNESS.

1. The damages caused by a collision when both boats are in fault must be divided between them.

2. A boat should be run in a fog at moderate speed, and with caution.

3. A boat which has missed its landing in a fog, and is turning around to return to it in the fair way of other boats navigating the river, ought to blow three whistles, as provided in rule 10 of pilot rules.

4. What is a fog signal?

5. A pardon does not restore the credit of a person convicted of an infamous crime, and therefore such a person is not a witness entitled to full credit.

In admiralty.

William H. Effinger and Richard Williams, for libellant.

Wm. Strong and Frederick Strong, for respondent.

DEADY, District Judge. During the autumn of 1874, the libellant and the respondent were engaged in running competitive lines of steamboats on the waters of the Wallamet and Columbia rivers, between Portland and Astoria. On the morning of October 29, 1874, the Josie McNear, belonging to the respondent, and the Wallamet Chief, belonging to the libellant, started from Portland for Astoria. The Chief is a light-built, stern-wheel boat, about 150 feet in length, while the McNear is a heavy, disconnected, double engine, side-wheel boat, about 109 feet in length, with a solid bow and very strongly built. The usual time of starting from Portland was 6 a. m., but on this occasion the McNear started about ten minutes, and the Chief about 35 minutes behind time. The latter was delayed on account of not reaching her wharf the night before, on her trip from Astoria, until 12 o'clock. The cause of the delay of the McNear was trifling and immaterial. The wharfs from which the boats started were some distance apart, that of the Chief being farthest up the river. In going to Astoria, she would pass immediately in front of the McNear's wharf. The morning was foggy, so that at times it was necessary to run with a compass; but most of the time the banks of the river could be sufficiently distinguished to make the use of the compass unnecessary. As a rule, the fog was thicker immediately upon the sur-

face of the water than above it until the time of the collision, when it began to rise. Both vessels were in the habit of calling at St. John, a place on the right bank of the Wallamet, about five or six miles below Portland. On this occasion the McNear had a passenger for St. John, and reached the place a few minutes after 7 o'clock, but passed the wharf without being aware of it. The sight of the barrel factory above the wharf apprised the master of his mistake, when he stopped his engines, and let his boat run out her way, and then blew a blast upon his whistle to signify his intention to land, and turned up stream, backing upon one wheel, and going ahead upon the other. As the McNear headed up stream, she was about 100 feet from the St. John shore, and about 200 yards below the St. John wharf.

The Chief followed the McNear down the river without seeing or hearing her, until about a mile above St. John, when her master heard the landing whistle of the latter, and very naturally supposed that the McNear was about to land at Springville, a place on the left bank of the river, and about ¼ of a mile below St. John. The Chief had neither freight nor passengers to discharge at St. John, but as usual bore in for the wharf as she passed, so that she might land readily and take on whatever might be there for her, if anything. On this morning, she came to the wharf at a speed of 6 or 7 miles an hour, and about 150 feet out in the stream. There was nothing on the wharf for her, and she did not attempt to land. Just here, the master of the Chief "sighted" the McNear about 200 yards ahead, but made the mistake of supposing that she was going from him. With that, he gave one blast of his whistle to signify his intention to pass to the right, and started ahead under full steam—about 12 or 14 miles an hour. When within about 200 feet of the McNear the master of the Chief discovered his mistake, and observed that the former was meeting him instead of going from him. He immediately gave the signal to reverse the engine and commenced backing.

The master of the McNear heard the whistle of the Chief to pass to the right, but made no reply to it, and testifies that he took it for a fog whistle. After turning up stream the McNear continued in motion and headed for the wharf. In this position, assuming that she was going down stream, as the master of the Chief supposed, she would appear to be going away from the bank, and widening the space between herself and the east shore, over which the Chief intended to pass. When the boats were within about fifty feet of one another, the McNear blew two whistles to signify her intention to pass to the right, to which the Chief made no response. At the same time she commenced backing. But it was then too late to prevent the collision, and the only thing to be done by either party was to lessen the force of it by backing the engines. Both boats were still moving forward when

they came in contact. The bow of the McNear struck the port bow of the Chief about six feet back of the stem, and cut her down to the water line for a distance of about twenty feet. At the time both boats were pointing towards the east shore, the McNear more so than the Chief. The force of the blow turned the bow of the McNear down stream, so that she was almost at right angles with the bank. She immediately backed off into the stream and then proceeded to the wharf, where it was found she was not materially injured. The Chief's bow was also turned toward the shore by the blow. She was immediately run on to the bank, but her master thinking that her bulkheads would keep her afloat, started back for Portland. But a short distance above St. John it was found she was sinking, and she was beached. Afterwards she was raised, taken to Portland and repaired.

Upon this state of facts I think both vessels are to blame, and the result of the collision must be borne between them. The remote cause of the trouble doubtless lay in the fact that the boats belonged to rival lines, and were then running in opposition to one another.

When the master of the Chief "sighted" the McNear there was considerable fog on the river, so much so that he mistook her stern for her bow at a distance of 200 yards —not a very great mistake probably—but enough to show that there was a necessity for careful and slow running on account of the fog. The master of the Chief was entitled to pass on the right, whether the McNear was going up or down stream, and therefore he gave the proper signal—one blast of his whistle. See Rev. St. § 4233, Rule 18; and rules 1 and 11 of pilot rules of Jan. 1, 1872. But I do not think he was justified under the circumstances in attempting to pass her at the rate of speed he did. He was in a fog and should have proceeded at a moderate rate of speed, as provided by rule 21 of section 4233 supra—at least until he was near enough the McNear to be certain of her movements and direction. It seems to me that he was also lacking in diligence and attention when he ran 400 feet after he started to pass the McNear, and to within 200 feet of her before he discovered his mistake in supposing that she was going away from him, when the fact was she was approaching him with her bow inclined to the shore and across the line of his direction.

It is probable that he was so elated with the idea of overtaking and passing a rival who had left him behind that morning, under the impression that by reason of the Astoria accident, he would be unable to make this trip, that he forgot or disregarded the fact that he was running in a fog in the proximity of another boat, and that his first duty was to navigate the Chief safely and avoid the chances of a collision with the McNear. If the McNear had been going down stream and moving out from the bank,

as he supposed, the Chief might have passed her with safety. But in this supposition, however plausible, the master of the Chief was in error. Had there been no fog, and had he kept a diligent lookout, he could not have made the mistake of supposing that the McNear was going from him when she was approaching him, with no object between them, until she came within 200 feet of him. But because the utmost diligence will not prevent mistakes, as to the character, distance and motion of objects in a fog, the law very properly requires that a vessel under such circumstances shall be run at a moderate rate of speed and with caution. When the master of the Chief, having "sighted" the McNear 200 yards below him on the right side of the river, crowded on all steam and undertook to pass her without having a reply to his signal, and did not observe until he came within 200 feet of her, that the McNear, instead of going away from him was meeting him, "head and head," he was guilty of misconduct and negligence that directly contributed to this collision.

The conduct of the master of the McNear was also seriously a fault. He was aware of the delay of the Chief in reaching her wharf night before, and he had every reason to know, that if she was on the route that morning at all, she was somewhere behind him. In his testimony he undertakes to give impression he had upon the subject in the following contradictory statement. Speaking of the single whistle of the Chief which she gave when her master "sighted" the McNear, he says: "It was the first intimation I had that the Chief was coming our way behind me. I knew that she was disabled the night before—that is, I knew she got up late, and had paid but little attention to her supposing she was ahead of me, as we were a little late."

He also knew that there was no boat belonging to any regular line on that river, that would be expected to be found ascending it at that place, anywhere near that time of day, and that therefore his landing whistle as he was descending the river below St. John would naturally give the impression to boats behind him that he was descending the river and about to land at Springville. Having missed his landing at St. John, as he might under the circumstances without serious fault, and gone some distance below and whistled to land, when he commenced turning up stream, in the fair way of descending steamers, there being at the time a fog on the river, which he testifies prevented him from seeing the Chief at a greater distance than 250 feet, he should have signified his condition by three distinct blasts of his whistle, as provided in rule 10 of the pilot rules aforesaid. But, at all events, when he heard the single whistle of the Chief to pass to the right, he should have answered it, and put his wheel to port, and then the boats might have passed without collision.

But the respondent maintains that the master of the McNear did answer the Chief's signal to pass to the right, and such is his testimony. He also swears that at the same time he stopped both engines and gave the signal to pass to the left—two whistles—and that the Chief answered with two whistles. The master of the Chief swears that the McNear did not answer his signal to pass to the right, and that he did not answer hers to pass to the left, as the collision was then unavoidable. Upon this point the decided weight of the evidence in the case is in favor of the statement of the master of the Chief. Besides, if this point rested upon the evidence of the two masters alone, it would have to be decided according to that of the master of the Chief. It being proven that the master of the McNear has been convicted of an infamous crime, he is not a witness entitled to full credit. It is admitted that the fact of his conviction affects his credibility, but it is claimed that his subsequent pardon by the president—February 27, 1869—restores it. No authority has been cited for this novel proposition; and it is wholly contrary to the nature and reason of the matter. If the pardon established his innocence with the same degree of certainty that the conviction did his guilt, then it would follow that his credibility was thereby restored. But nothing short of this can give it such effect. But as a matter of fact, a pardon by the president is no proof of the innocence of the party receiving it, although it may have been granted upon the belief or impression that the party was not or might not be guilty. It is, or certainly was at the date of this pardon, an ex parte proceeding, taken upon the ex parte statements, representations and solicitations of sympathizing friends and interested and uninformed parties, and cannot be said to prove anything except its own existence and the fact that the party was entitled to have, or had the influence requisite to procure the application of the executive clemency to his case. A pardon does not profess to be a reversal of the judgment of conviction, but only a relief from the punishment imposed by it. In every other respect the judgment stands as if no pardon had been granted. These remarks are made, of course, with reference to pardons in general; but there is nothing upon the face of this one, or in the circumstances of the case, calculated to take it out of the general rule.

The master of the McNear also swears that he took the signal of the Chief to pass to the right for a "fog whistle," and in support of this conclusion he testifies that a fog signal is a "short blast" of the steam whistle. But this is a manifest error, and betrays a want of knowledge upon the subject, which may have materially contributed to this collision. The signal to pass to the right, whether boats are meeting "head to head" or running in the same direction, is "a short, distinct blast" (see rules 1 and 11 of the pilot rules aforesaid); while a fog signal is made by sound-

ing the whistle at intervals of not more than a minute (see rule 15 of section 4233 aforesaid). Now, to sound a whistle is something the opposite of and different from "a short, distinct blast" of it, and necessarily in this connection implies duration—a drawing out—like blowing a horn.

Upon the evidence it satisfactorily appears that the master of the McNear was guilty of misconduct in not sounding three whistles when he stopped in the stream below St. John and turned completely around—in not answering the signal of the Chief to pass to the right, and at once putting his wheel to port, or in misunderstanding such signal, if he took it for a fog signal and therefore did not answer it, and that he thereby directly contributed to produce this collision.

The damages in this case, except the claim for general depreciation, are not seriously contested. The cost of repairs was $925. The net earnings of the boat appear to have been $500 per month, and the pay roll of her crew for the same time $1,000. For demurrage the claim is for one-third of a month, for loss of net profits $166, and for expenses of crew $333. But I think the testimony warrants the inference that the steward and his help and the purser were not retained during the detention, or were elsewhere employed, and for this item only $200 is allowed; making the aggregate for repairs and demurrage the sum of $1,291. For general depreciation the claim is $6,000. I think there can be no doubt upon the evidence but that some damage ought to be allowed under this head, although it is difficult to fix any precise sum. In my judgment it ought not to be less than $3,000, and I allow that sum. See Wallamet R. T. Co. v. Oregon S. N. Co., No. 382 [unreported]. This added to the foregoing sum, makes $4,291, the one-half of which—$2,145—with interest for one year and eight months—$286—the libellant is entitled to recover off the respondent. These estimates being made in coin, and the respondent being entitled to satify the decree herein in U. S. currency, a decree will be entered for the libellant for the foregoing sum—$2,431—with ten per centum thereon, making $2,674 in all, without cost.