Statement of the case.

No. 2461.

## JOHN BENNETT *v.* THE STATE.

1. PRACTICE—IMPEACHMENT OF WITNESSES.—Article 755 of the Code of Criminal Procedure provides that "the rule that the party introducing a witness shall not attack his testimony is so far modfiied as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness." *Held*, that before this rule can be applied, the witness must have stated some fact in evidence which was injurious to the cause of the party in whose behalf he was called to testify; and it is not enough that he merely made a statement different from that which the party had reason to and did believe he would make.    See the opinion for a state of case to which the rule does not apply.

2. SAME—SURPRISE.—The rule obtains in this State that if a party be bona fide surprised at unexpected testimony of his witness, he may be permitted to interrogate his witness as to his previous declarations inconsistent with his testimony,—the object being to test the witness's recollection, and to enable him, if mistaken, to review his evidence. Such corrective testimony is also admissible to explain the attitude of the party calling the witness; but if the sole object of the proffered testimony be to discredit the witness, it will not be received.   See this case in illustration.

3. SAME—CREDIBILITY OF A WITNESS—PRIVILEGE OF COUNSEL.—While a full pardon, granted by competent authority, to one who has been convicted of felony, removes the legal odium from such person, and qualifies him to testify as a witness in the courts of this State, it does not remove the question of his credibility from the consideration of the jury; nor will it operate to prevent opposing counsel from urging in argument that, notwithstanding such pardon, the witness, by reason of his conviction for felony, is entitled to no credit.   The trial court did not err in refusing to restrain the State's counsel in such argument.

APPEAL from the District Court of Johnson.   Tried below before the Hon. J. M. Hall.

The conviction in this case was for the theft of one head of cattle, the property of Thomas Sparks, in Johnson county, Texas, on the sixteenth day of March, 1885.   The penalty assessed against the appellant was a term of two years in the penitentiary.

Thomas Sparks was the first witness for the State.   He testified, in substance, that he lived about twelve miles south of Cleburne, in Johnson county, Texas, and lived there in March,

1885.   His certain unmarked yearling, the same described in the indictment in this case, ran on the range, near witness's house, during the spring of that year.   On or about the day alleged in the indictment the witness saw the said yearling on the said range.   It had then been recently branded with the device of a spur, which was the defendant's brand.   A few days after that discovery the witness was accosted by the defendant, who said: "I understand that one of your yearlings has my mark and brand on it."   Witness replied that he was correctly informed, and defendant said:   "Well, then, you have got us."   Witness then asked him what he meant, and he replied:   "That is the first yearling I ever put the spur brand on, but I want you to understand that I did not steal it.   I bought it from Henry Goodspeed, but I don't want you to say anything about it."   Witness replied to this that he intended to enforce the law against the defendant.   Defendant replied:   "That is all right; but I want you to hold up until I get my money out of Goodspeed.   If he hears of it he will run off, and I will not get my money back."   Witness did not consent that defendant should take, or mark, or brand the said yearling.

Cross examined:   The witness testified that, in the course of the conversation recited, the defendant said that when he bought the yearling from Goodspeed he did not know that it belonged to the witness, and that he thought Goodspeed owned it and was conveying a good title.

Henry Grafa was the next witness for the State.   He testified that, between the tenth and fifteenth days of March, 1885, the defendant came to his house, introduced himself, and asked if witness wanted to buy any steers, adding that he had two for sale.   Witness replied that he did not want to purchase any steers.   He then asked if witness had seen any stray yearlings in the country.   The witness replied that there was then a stray yearling in his pasture.   Witness and defendant then went to the pasture, and witness showed defendant the yearling described in the indictment.   The defendant claimed the yearling as his property, and drove it off.   He said that his brand was HL connected, but that he thought of starting the spur brand. Three or four weeks later, the witness went to Thomas Sparks's house and picked out from several the yearling described in the indictment as, and which was, the same yearling defendant drove from his place.

Cross examined:   The witness stated that Mr. Robert Barry was

the owner of the pasture from which the yearling was taken by the defendant. When he claimed and took the yearling, the defendant did not say anything about having purchased it from anybody. Witness had so far interested himself in the prosecution of this case as to subscribe five dollars towards the fee for the employment of special prosecuting counsel. Witness denied that he had ever attempted to get the Kyle boys to give evidence on this trial different from that they gave before the grand. jury, or that he had ever threatened to procure their indictment for perjury if they testified on this trial as they did before the grand jury.

Henry Goodspeed testified, for the State, that he lived near the defendant's house in 1885. He emphatically denied that he ever, at any time, sold or traded this or any other yearling to the defendant. Shortly after his arrest on this charge, the defendant appealed to witness to testify that he sold the said yearling to defendant. Just before this case was called for trial, the defendant appealed to witness to testify in his behalf.

On his cross examination, the witness stated that he was on his father's place on or about March 20, 1885, when officers Coulter and Stewart visited that place. He was about a half mile distant when he saw the officers going towards his father's house. As he supposed a warrant had been issued against him for the theft of this yearling, it occurred to him that the said officers were seeking to make his arrest. When the officers rode towards him, the witness turned his horse and started off. The officers increased the speed of their horses, which, being observed by the witness's horse, the latter animal struck a run and distanced the officers. Witness went to a neighbor's house, sent his horse home, and then made his way to Fannin county, where he was arrested three weeks later. Witness fled the country, not because he was guilty, but because he wanted to ascertain if he could make bond before submitting to arrest.

Hardy Kyle was next introduced by the State. He testified that he had never heard the defendant say anything about the Sparks yearling. He denied that the defendant offered to pay him to testify on his behalf before the grand jury that he bought the yearling from Henry Goodspeed. He further denied that he ever told Captain English, special prosecuting counsel, that he, witness, was so drunk when he was taken before the grand jury that he did not know what he testified. On his cross examination he testified that he was at the house of defendant's father on

a certain day in March, 1885, when a man, a stranger to him, but who, in general appearance, resembled Henry Goodspeed, came to the yard fence driving a yearling answering to the description of that described in the indictment. Defendant joined that man at the fence and bought the yearling, paying five dollars for it. That yearling was then unmarked and unbranded.

Captain J. N. English testified, for the State, that during the preceding term of the court the witness Hardy Kyle told him that defendant tried to hire him to go before the grand jury, and to appear in this court and testify in his behalf. He also told witness that he was so drunk when he was before the grand jury that he did not know what he swore to.

Several State witnesses testified that the defendant had long been familiar with the range, was an experienced stockman, and ought to have known Sparks's cattle in March, 1885.

The State closed.

—— Kyle testified, for the defense, that he, in company with his brother, Hardy Kyle, was present at defendant's father's house in March, 1885, and saw the defendant buy a certain red heifer yearling from a man whom he thought, but was not certain, was Henry Goodspeed. Defendant paid five dollars for the animal.

Under the circumstances stated in the opinion, Richard Bennett, the father of the defendant, testified, in substance, that in March, 1885, he saw Henry Goodspeed drive a yearling to his house and enter into a conversation with defendant and the two Kyle boys. Presently the yearling was turned into the lot, when defendant came to the house and said that he had bought the animal from Goodspeed. The animal was then unmarked and unbranded. The animal escaped from the lot and was gone for several days. It was again penned by defendant, and put in his mark and brand. Subsequently it was claimed by Sparks. The witness then saw Goodspeed about the matter, and asked him what he meant by the transaction. Goodspeed merely replied that defendant could have got along very well without involving him in the trouble.

Deputy sheriffs Coulter and Stewart testified, for the defense, that they undertook to arrest Henry Goodspeed for this theft, in March, 1885. They chased him about six miles, into the brush of Noland's creek, when he abandoned his horse and escaped, the horse being captured by the witnesses. Subsequent to the arrest of defendant, Henry Goodspeed surrendered.

The defense closed.

Henry Goodspeed, recalled by the State, in rebuttal, testified that he and Hardy and George Kyle had been intimately acquainted for several years, and knew each other well in March, 1885. Witness admitted that early in 1885 he traded three head of cattle to the defendant for a saddle and five dollars. He did not, however, in March, 1885, or at any other time, drive the Sparks or any other yearling to Richard Bennett's house, and there trade it to defendant.

The motion for new trial raised the questions discussed in the opinion.

*Poindexter & Padelford,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. By article 755, Code of Criminal Procedure, it is provided that "the rule that the party introducing a witness shall not attack his testimony is so far modified as that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness."

On application of this change in the rule to any particular case, the question is, did the witness state facts injurious to the party calling him as a witness? (Tyler v. The State, 13 Texas, Ct. App., 205; Thomas v. The State, 14 Texas, Ct. App., 70.) In other words, before the right accorded by the statute can be availed of, some statement must have been made by the witness injurious to the cause he was called to testify in behalf of. It is not sufficient that the witness makes a statement different from what the party calling him had reason to believe and did believe he would make, if the statement made is not injurious.

By the bill of exceptions in this case it is shown that the prosecution had placed one Hardy Kyle on the stand as a witness for the State, and on his direct examination he stated: "I never heard defendant say anything about the Sparks yearling." This is in full all the statement made by him. Does it appear that this statement was injurious to the State or any one else? If so, then any negative answer to a question propounded where an affirmative was desired, and vice versa, might be claimed to be injurious.

After the witness had so stated, over objection of defendant,

the court permitted the prosecution, with avowed purpose, to first lay a predicate, and then introduce evidence to impeach its witness by proving that said witness had on another occasion stated to counsel for prosecution "that defendant had tried to hire him (witness) to go before the grand jury and testify for him in this case, and that he had offered to hire him to testify before the jury, and that he was so drunk when before the grand jury that he did not know what he then swore."

In our opinion, a proper and sufficient case in which the impeachment of one's own witness would be allowable is not established by the facts shown. A case of surprise at testimony other than that expected and calculated upon is perhaps shown. But there is a well defined difference in the rules with reference to surprise and impeachment. "A party bona fide surprised at the unexpected testimony of his witness may be permitted to interrogate the witness as to his previous declarations alleged to have been made by the latter, inconsistent with his testimony, the object being to probe the witness's recollection and lead him, if mistaken, to review what he has said. Such corrective testimony is also receivable to explain the attitude of the party calling the witness. But when the sole object of the testimony so offered is to discredit the witness, it will not be received." (White v. The State, 10 Texas Ct. App., 381, quoting from 1 Wharton's Ev., sec. 549.)

The ruling complained of was erroneous, and it can be readily imagined how the testimony admitted to impeach the State's witness, Kyle, even had it been pertinent to the issue raised, which is not made apparent, was most prejudicial to the rights of this appellant.

Before finally disposing of the case it may be well to consider the third bill of exceptions, which, in so far as we are advised, submits a question never heretofore adjudicated in this State. When defendant called his father, Richard Bennett, as a witness, he was objected to by the State, because of incompetency, in that he had been convicted and incarcerated in the penitentiary for a felony. (Penal Code, art. 730, subdiv. 5.) To this the defendant replied that the witness had been legally pardoned for said offense, and produced the Governor's full charter of pardon. The objection was properly overruled, and the witness testified. Afterward, in argument to the jury, when counsel for the prosecution were insisting that, notwithstanding the pardon, the witness was entitled to no credit on account of his former

conviction, defendant objected to such line of argument as illegal and unwarranted, and asked the interposition of the court to arrest and prevent it.  This the court declined to do, and in his explanation to the bill of exceptions the learned judge says: "If the witness had been convicted of a felony and pardoned, it went to his credibility as a witness, and the jury had a right to know the character of the witness before them, and the attorney had the right to comment upon the credibility of the witness."

With regard to the general effect of a pardon, the accepted doctrine is that a full pardon absolves the party from all legal consequences of his crime; it makes the offender a new man; it blots out his offense and gives him a new credit and capacity, and even so far extinguishes his guilt as that, in the eye of the law, the offender is as innocent as if he had never committed the offense.  (Hunnicutt v. The State, 18 Texas Ct. App., 499; Carr v. The State, 19 Texas Ct. App., 635, and authorities collated and cited.)  Notwithstanding this comprehensive doctrine, it seems equally well settled that, whenever the pardoned convict is presented as a witness, the judgment of his conviction may be put in evidence against him.  Mr. Wharton says: "But a pardon does not preclude such conviction from being put in evidence," and in support of his text he cites in the note a long array of authorities of the highest standing.  (Wharton's Crim. Ev., 8 ed., sec. 489, taken from the opinion in Curtis v. Cochran, 50 N. H., 244.)  In that opinion it is said: "A pardon is not presumed to be granted on the ground of innocence or total reformation.  (Citing authorities.)  It removes the disability, but does not change the common law principle that the conviction of an infamous offense is evidence of bad character for truth.  The general character of a person for truth, bad enough to destroy his competency as a witness, must be bad enough to affect his credibility when his competency is restored by the executive or legislative branch of the government."  Mr. Greenleaf seems to think that a pardoned felon who has served his full term in the penitentiary "would be entitled to very little credit."  (1 Greenl. Ev., 13 ed., sec. 377.)

Mr. Starkie says: "And although a pardon can not convert a wicked man into an honest one, and confer credibility upon one who through the infamy of his conduct is not credible, yet such a pardon must be presumed to have been conferred after inquiry, upon good and sufficient ground, on an object worthy of the

indulgence, and therefore worthy of being heard, but the degree of credit is still to be left to the jury." (1 Starkie's Ev., 7 Am. ed., p. 99.)

It was held in Baum v. Clanse, 5 Hill, New York, 196, that "though the pardon of one convicted of felony will in general restore his competency as a witness, yet the conviction may still be used to affect his credit."

In the light of these authorities the action of the court in the premises, complained of in the third bill of exceptions, was not erroneous. Other errors presented will not be noticed, because they may not arise on another trial. Because of the error in the first matter discussed, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered October 22, 1887.