[Crim. No. 3087. In Bank.—July 18, 1928.]

THE PEOPLE, Respondent, v. JOE HARDWICK, Appellant.

Edgar B. Hervey and M. W. Conkling for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, and Elmer W. Heald, District Attorney, for Respondent.

THE COURT.—The petition for a hearing in this court after decision by the district court of appeal, second appellate district, division two, was granted. Further consideration of the record and of the points involved has persuaded us of the correctness of the conclusions expressed by the district court of appeal. We therefore adopt the opinion of the district court of appeal, of which Mr. Justice Thompson is the author, as the opinion of this court. The opinion is as follows:

"The defendant was convicted of assault with a deadly weapon upon William A. Taylor and appeals from the judgment of the court pronounced upon the verdict and from an order denying his motion for a new trial.

"The undisputed facts are that on the evening of February 3, 1927, Taylor, in company with his wife and six male companions and their wives, had been at the Climax Cafe in Mexicali, Mexico, from about 7:30 in the evening, eating, drinking and dancing; that about 8:50 P. M. they recrossed the international line into Calexico, California; that upon their arrival in Calexico they separated into two groups of seven each, for the purpose of driving home in two automobiles; that very soon after Taylor and a Mrs. Booker seated themselves in one of the machines, the defendant, who was a peace officer, approached the automobile and demanded that they not make so much noise; that in the conversation which immediately ensued the defendant said in effect that he ought 'to throw' Taylor 'in'; that Taylor demanded to see Hardwick's authority; that Hardwick grabbed Taylor in an effort to pull him out of the machine and shortly after shot him; that the bullet entered the body near the left nipple and lodged under the skin in Taylor's back, whence it was subsequently removed; that after the shooting Taylor was taken into the police station where the officers secured the services of a physician. This in substance comprises the undisputed facts. There is a sharp conflict on other matters. The defendant and several of his witnesses testified that the party returning from Mexico was very noisy and boisterous. The defendant asserts that his attention was attracted to the car in which Taylor and Mrs. Booker were sitting by the noise made by a woman and that as he approached it he heard her exclaim,

'Oh! Oh! Quit, let me alone,' several times. Appellant further testified that when Taylor demanded his authority he threw back his coat and displayed his badge not once but twice; that after he tried to pull Taylor out of the machine Taylor made a move with his right hand toward his right hip pocket as though to draw a gun, accompanying the move with profanity and that he, being fearful of his life, shot. He testified further that the only members of Taylor's party in or at the automobile were Taylor and Mrs. Booker. He was corroborated in this testimony by his nephew, who said that he heard a woman screaming; that his uncle went over to see what the trouble was and a few minutes later called him and his cousin, Roly Hardwick, over there, saying something about trouble; that he saw his uncle show Taylor his badge, saw the attempt to pull Taylor out of the automobile, followed by the motion of Taylor as though to draw a gun, and saw the shooting; that Roly was there with him until he was told by his uncle to get a policeman and get him quick and that no member of Taylor's party was present except Taylor and the one woman. The testimony of the People's witnesses may be fully illustrated by stating in substance the testimony of Taylor, who was corroborated in all important points by four of his witnesses who claimed to have been in a position to see and hear. He testified that Mr. and Mrs. Smith and Mrs. Jones branched off from his party of seven, the three of them going to the rest rooms of a Shell Oil Company station near by and did not come up to the car until about the time that he told the defendant that he wasn't aware of the fact that they were making any noise and also told the defendant to leave the young lady 'out of the conversation'; that Hardwick at no time placed him under arrest or showed him an emblem of authority; that after his refusal to show his authority he resisted the defendant when he tried to pull him out of the car, whereupon Hardwick called out 'Come over here you, fellows,' and after a few more words, pulled his gun and shot.

"The appellant's first complaint is the refusal of the court to give the following instruction: 'An officer having legal authority to make an arrest who is resisted by the person whom he attempts to arrest is under no obligation to wait for assistance or retire in order to avoid a conflict with the

person he thus attempts to arrest or to retire in order to avoid injury at the hands of any such person who he attempts to arrest or to wait for assistance in the making of any such arrest by reason of any resistance offered and that *it is the duty of all persons who commit any crime be it felony or misdemeanor in the presence of an officer to peacefully submit to arrest and not to offer any resistance.'* (Italics ours.) The court refused to give the instruction *in toto* but did give the italicized portion and also gave an instruction, a portion of which reads as follows: 'If you believe from the evidence in this case that Taylor, at the time of his arrest, if he was arrested, or at the time defendant was approaching the car which Taylor and Mrs. Booker had entered, was drunk or committing a disturbance of the peace or any other public offense, then and in either such case, it was the duty and right of the defendant to arrest Taylor, and for that purpose he was authorized to use whatever force was necessary to take Taylor into custody, and if Taylor resisted such arrest, and in the course of such resistance threw back his hand as if to draw a gun, and, if from that act and other circumstances in the case, the defendant honestly believed, and, as a reasonable man, had good cause to believe that he was in imminent danger of suffering death or great bodily harm at the hands of Taylor, then the defendant was justified in shooting Taylor for the purpose of disabling or killing him, if that appeared to be necessary in order to protect himself and in such case, the defendant would not be accountable, and you should acquit him even though it should afterwards appear that Taylor was unarmed, and that the indication on which the defendant acted was wholly fallacious, and that he was not in actual peril. On the other hand, if, after considering all of the evidence in this case you believe, beyond a reasonable doubt, that Taylor had neither committed, nor was in the act of committing any public offense at the time the defendant approached the car on the night in question, then the arrest of Taylor by the defendant, if he was arrested, would be unlawful and Taylor would have a right to resist such unlawful attempt to arrest him, though he would not have a right to resort to extreme measures, such as using a gun or other dangerous weapon in such resistance, unless circumstances existed at the time the arrest was being at-

tempted which were reasonably sufficient to justify him in the belief that he was about to be injured in body or limb, or that his life was in danger from the defendant. If the arrest of Taylor was unlawful, and was made without probable cause, or if the arrest was made by the defendant in bad faith and for the purpose of oppression, then and in either such case the defendant, as between himself and Taylor, would be the first aggressor, and the defendant would not be permitted under the law to justify his act of shooting Taylor on the ground of self-defense unless he had in good faith, before he fired the shot that wounded Taylor, desisted from all threats, if any, and all acts of violence, if any, and had withdrawn from his attempt to arrest Taylor, if he was attempting to arrest him.' There was another instruction which stated the conditions under which the right of self-defense may be asserted, including the following: 'that the party may not himself be the first aggressor, or, if the aggressor, that he has in good faith withdrawn from the contest before the fatal blow.'

"It is the claim of appellant that in these instructions, together with others which define with greater particularity the element of apparent necessity to resort to extreme measures to prevent receiving great bodily injury, the trial judge overlooked the distinction between a peace officer and a citizen; that while the citizen may be obliged to retreat to avoid the necessity, that the officer is under no such compulsion, but rather is obligated to press forward for the accomplishment of his purpose. There can be no doubt that appellant's statement of the law is correct, but in this connection we must bear in mind that there is a substantial difference in using an undue amount of force to prevent escape from that of using all the force necessary to overcome resistance. In *Krueger* v. *State,* 171 Wis. 566 [177 N. W. 917], it is said that 'While in order to apprehend the person charged with a misdemeanor only an officer may not take the life of the person so charged, it does not follow by any means that any resistance offered to the arrest may not be overcome to the extent of taking life, if that be necessary to overcome the resistance. . . . It was not only his privilege but his duty to overcome such resistance, and the taking of life necessary to do so constitutes justifiable homicide under section 4366, Stats.' And in *State* v.

*Dierberger,* 96 Mo. 666 [10 S. W. 168, 9 Am. St. Rep. 380], the court says: 'The officer must of necessity be the aggressor. His mission is not accomplished when he wards off the assault. He must press forward and accomplish his object. He is not bound to put off the arrest until a more favorable time. Because of these duties devolved upon him the law throws around him a special protection.' Further quotations might be added to the same effect from the old books of the common law, which are today accepted as guides to our modern law. . (See quotations and citations, Bishop's New Criminal Law, vol. 2, secs. 647 et seq.)

 Under this state of the law the jury should unquestionably have been told, in view of the testimony which justified them in believing that the defendant was endeavoring to make an arrest for a misdemeanor, that he was under no obligation to retire in order to avoid a conflict. They were informed that before the defendant could possibly be justified in the use of a deadly weapon he could not have been 'the first aggressor, or, if the aggressor, that he' had 'in good faith withdrawn from the contest before the fatal blow.' As is stated in the quotation from *State* v. *Dierberger, supra,* the officer must under the law be the aggressor. The court endeavored, however, to define what was meant by the term aggressor as used in the instruction by saying that if the arrest were unlawful or oppressive the defendant would be the first aggressor. Did the jury understand from this that the defendant in the eyes of the law would only be the aggressor in the event of an unlawful attempt to make an arrest? Ordinarily it may be said that the statement of one instance where the person would be an aggressor would not conclude the possibility of his being an aggressor otherwise. However, as a part of this same instruction the jury were told that if Taylor was in fact committing any offense at the time of the attempted arrest, 'it was the duty and right of the defendant to arrest Taylor, and for that purpose he was authorized to use whatever force was necessary to take Taylor.' Reading the two portions of these instructions together we think the jury could gather no other idea than the one that only in the event the attempted arrest were unlawful or oppressive would the defendant be the aggressor, and that otherwise it was his

duty to press forward and make the arrest, using all the force necessary to accomplish that purpose.

██ "During the trial of the defendant, who was a witness, evidence was introduced, for the purpose of impeachment, establishing that the defendant had been convicted of the offense of manslaughter in the state of Oklahoma, and thereafter the defendant sought to introduce an unconditional pardon by the governor of that state in which it is recited that the defendant was first granted a parole on the recommendation of the board of prison control and that 'since the granting of said parole' the defendant has 'lived the life of a good, upright, law-abiding citizen, and as such is entitled to a full pardon.' The court excluded the pardon and in connection with this phase of the case instructed the jury as follows: 'Where the defendant in a criminal case testifies as a witness in his own behalf he may be impeached by showing that he has been convicted of a felony, if such is the fact; and such showing may be made by examination of the defendant himself or it may be shown by the record of the judgment of the conviction. Such impeachment affects only the credibility of the witness. It is permitted upon the theory that a man who has been convicted of a felony is less likely to be honest and truthful in his testimony than a man who has not been convicted of a felony. It does not, however, impeach the character of defendant for the peace and quiet, or prove, or tend to prove, in any way, the charge upon which he is on trial, and no such inference should be drawn from the impeachment or from the judgment of conviction upon which the impeachment is based (Code Civ. Proc., sec. 2051), and anything said or done in the presence of the jury concerning a pardon which may or may not have been granted to defendant, it having been stricken from the record, is of no consequence in this case, and must be disregarded by the jury, as must all other evidence which has been ruled out or stricken or to which objections have been sustained.'

"Counsel complains of the action of the court in this respect for two reasons—first, that the court erred in giving the instruction, and particularly that portion in which it is stated that one 'who has been convicted of a felony is less likely to be honest and truthful in his testimony' than one who has not been convicted, asserting that the court should

have given a requested instruction to the effect that it is for the jury, and the jury alone, to say what effect the conviction will have upon their mind; second, that the conviction being admitted, the pardon was admissible, together with the circumstances attending the conviction. He also asserts that the record disclosing that the district attorney, having knowledge of the pardon, it was prejudicial error for the district attorney to mention the conviction before the jury. However, inasmuch as appellant concedes the admissibility of the conviction, regardless of the pardon, it is impossible to conceive any legitimate reason why the district attorney should not mention the conviction.

"Should the court have given that portion of the instruction just mentioned and refused to give the following instruction? 'A previous conviction of a felony does not necessarily destroy the credibility of any witness, nor does it raise a presumption that the witness has or will testify to that which is false. It is simply a circumstance of more or less weight which you are authorized to take into consideration in determining what credit shall be given to him with respect to his testimony.' It is not debatable that the instruction asked by defendant correctly states the law applicable to the situation. It was for the jury to say, in view of all the circumstances, what credit should be given the witness, and the court has not the authority to suggest that, 'as a matter of law,' a former conviction 'deprived the particular witness of any portion of the credit presumptively due to the testimony of witness.' (*People* v. *McLane*, 60 Cal. 412.) It has been held that the effect of a former conviction, where introduced for the purpose of impeachment, must be left to the jury. (*Leventhal* v. *Home Ins. Co.* (Sup. Ct.), 165 N. Y. Supp. 323.) But here the trial judge in no uncertain terms informed the jury that the witness was not entitled to the same credibility as one who had not been convicted. And in so far as he did so he stepped beyond the judicial function and attempted to discharge the duty of the jury. This he could not do, nor was the error cured by a general statement included in the instruction usually if not always given, to the effect that the jury are the sole and exclusive judges of the effect and value of evidence. In this instance they were given to understand that, as a matter of law, a person who has been

convicted is deprived of a part, at least, of the credibility presumptively due the witness. We have heretofore recited sufficient of the testimony to disclose that the testimony was in sharp conflict and that had the jury not been misinstructed the trial might have terminated otherwise. We cannot say that the error is not prejudicial or that it has not resulted in a miscarriage of justice.

"While the error found to exist requires a reversal, yet, in view of the fact that the admissibility of the pardon will probably arise on a retrial, we must determine the law upon that question.

"In our consideration of the problem thus presented, and especially at a period in our civic development when there is being given great attention to procedural reform in an effort to secure sure and speedy justice, with the hope that it will result in a lessening of the commission of crime, it is most desirable that we realize that while the certain and swift conviction of the guilty is an end 'devoutly to be hoped for,' yet more important still, in the aim to free the citizens from violence, is the certain acquittal of the innocent. It is obvious that whenever in any country, in a mistaken zeal for conviction, the administration of the law has reached a point where the innocent are not safe, that respect and reverence for institutions and regard for the rules of social intercourse are blighted. There is no surer avenue to the increase of social crimes than for the state to permit the punishment of those who are not guilty. Long ago it was discovered that convictions were sometimes had where there was a doubt concerning the guilt, and that sometimes a man was guilty who was not really bad at heart and who evinced a sincere desire to atone for his misdeed. Such persons were fit subjects for pardon by the crown, in much the same manner as many persons who may have rebelled under a sense of grievance, mistaken or otherwise, were proper objects of a general amnesty. And as a general amnesty blots out the offense from the memory, so we find the early authorities concerning pardons making like statements. In *Hay* v. *Justices of the Tower*, 24 Q. B. 561, we read from Baron Pollock's opinion: 'By the prerogative of the crown the pardon extends far beyond the mere discharge of the prisoner from any further imprisonment. It is a purging of the offense. The king's pardon, says Hale,

"takes away *poenam et culpam*" (2 P. C. 278). This points to the character, condition and status of the convict. Again, in 2 Hawkins P. C., s. 48, the author says that pardon "does so far clear the party from the infamy and all other consequences of his crime that he may not only have an action for a scandal in calling him traitor or felon after the time of the pardon, but may also be a good witness. . . . " ' And Justice Hawkins, in his opinion in the same case, says: 'I cannot believe that it was the intention of the legislature that if a man had the great misfortune to be *wrongly convicted, and was pardoned on the ground that the conviction was wrong,* the queen's pardon, although absolving him from the pains of imprisonment, should nevertheless leave him to suffer the penal effect of his conviction by being prevented in future from following his avocation, notwithstanding the rectification of the error which had occurred.' (Italics ours.) And in an earlier case (*Cuddington* v. *Wilkins,* 1 Hob. 67 [80 Eng. Reprint, 216]), which was an action for slander by Cuddington, who had been convicted of larceny and subsequently pardoned, against Wilkins, who called the plaintiff a thief and attempted to justify his words by the conviction, it was held that the plaintiff was entitled to recover because 'the felony is by the pardon extinct.' Later, in the case of *Osborn* v. *United States,* 91 U. S. 474 [23 L. Ed. 388], Mr. Justice Field delivering the opinion of the court, says: 'The pardon of that offense necessarily carried with it the release of the penalty attached to its commission, so far as such *release was in the power of the government unless specially restrained by exceptions embraced in the instrument itself.'* (Italics ours.) And in Oklahoma, where the defendant in this case was formerly convicted and pardoned, we find that 'pardon reaches both the punishment prescribed for the offense and *the guilt of the offender; it obliterates, in legal contemplation, the offense itself,* and hence its effect is to make the offender a new man.' (Italics ours.) (*Ex parte Collins,* 32 Okl. Cr. 6 [239 Pac. 696], citing *Ex parte Crump,* 10 Okl. Cr. 133 [135 Pac. 428], to the same effect.) Mr. Chief Justice Wallace, in discussing a restoration to citizenship as distinguished from a full pardon, in the case of *People* v. *Bowen,* 43 Cal. 439–443 [13 Am. Rep. 148], says: 'It did not purport to remove the guilt of Davis, nor

wipe away the infamy by the law of the land attaching upon him by reason of his conviction. It sought to restore him to all the rights of citizenship possessed by him before his conviction of the offenses "above referred to," and to so restore him while he yet remained a convicted felon and with the consequential legal infamy attaching by law to that status. The stain of his iniquity flowing from his conviction is still left upon him by the executive. The judgment of the law upon that fact is that the credit of his oath is so absolutely and effectually destroyed that he cannot be trusted to testify at all; that it is not to be hoped that he will speak the truth, but must be conclusively assumed that he will not. *If the judgment be reversed the disability is, of course, necessarily removed; if the offense be pardoned the same consequences, too, would follow.'* (Italics ours.) Also, in a disbarment proceeding (*Matter of Emmons,* 29 Cal. App. 121 [154 Pac. 619]), founded upon a conviction of a felony which had subsequently been pardoned, after quoting from *Ex parte Garland,* 4 Wall. 333 [18 L. Ed. 366], to the effect that pardon not only releases the person from punishment but also blots 'out the guilt thus incurred, so that in the eye of the law he is as innocent of that offense as if he had never committed it,' and other authorities of like wording, it is said: 'Notwithstanding that the respondent *at one time stood convicted of a felony* and that the record of conviction might have been used as the foundation for this proceeding while the *judgment of conviction was in force,* it is no longer possible after the pardon to disbar him by this statutory proceeding wherein, if it is maintainable at all, judgment must go against him without any opportunity to defend against any present imputation against his moral character.' (Italics ours.) We conceive of this case as being particularly in point, because the record of conviction when introduced for impeachment purposes is a 'present imputation against' the 'moral character' of the witness.

"Basing the opinion in part upon the authority of *Sims* v. *Sims,* 75 N. Y. 466, wherein it is held that a conviction in a foreign jurisdiction, if admissible at all, is not conclusive, but may be rebutted by proof of innocence, the court in the case of *Sisson* v. *Yost,* 58 Hun, 609 [12 N. Y. Supp. 373], not only decides that the pardon is admissible,

but also that the witness may show 'the promptitude with which the pardon itself was granted, the reason why it was granted, and the time when the defendant was discharged,' the statement being added that 'all these facts would necessarily have had a very important bearing on the question of the credibility to be given to the witness.' The judgment was reversed for this error. As long as it remained the law that the witness was disqualified by the conviction there was a unanimity in the decisions that the pardon removed the disqualification. The pardon was consequently always admissible to effect the removal. Gradually the law was changed in many jurisdictions so that the conviction does not work a disqualification. And with this change has come a small measure of difference in the language of the opinions. The only authority which we have been able to discover wherein the pardon was refused admission by the court of last resort, is the case of *Gallagher* v. *People*, 211 Ill. 158 [71 N. E. 842], and although the appellate court in a former hearing of the same matter, then entitled *O'Donnell* v. *People*, 110 Ill. App. 250, decided that the pardon was admissible on the ground of 'common fairness to the witness,' the supreme court dismissed the argument with these words: 'Under the statute' (permitting the conviction for impeachment purposes only), 'the guilt or innocence of the defendant of the crime for which he had been convicted, his punishment, his term of service, etc., are wholly immaterial and incompetent. That he may have been pardoned proves nothing as to his credibility, and to permit evidence of that fact would simply be to introduce into the case a collateral issue.' This statement is at variance with the history of the reason for and the effect of a pardon. Respondent relies upon a statement in the case of *People* v. *Mackey*, 58 Cal. App. 123 [208 Pac. 135], but the question there was whether one who had plead guilty and been granted probation and served his probationary period might be confronted with the record, and it was held that he could not. The declaration that 'although the grant of a pardon makes a "new man" of the pardoned individual, his manhood is not revived to the extent that he may not be confronted with the record of his conviction whenever he testifies as a witness,' although *obiter* correctly states the weight of authority, concerning which we might have grave

doubt, were it not for section 2051, Code of Civil Procedure, and the almost unanimous voice of the decisions. It does not, however, decide the inadmissibility of the pardon. Counsel attaches considerable importance to the remarks of the district judge in the case of *Wallamet R. T. Co.* v. *Oregon S. N. Co.*, 29 Fed. Cas. 88 (No. 17,106), to the effect that 'It is, or certainly was at the date of this pardon, an *ex parte* proceeding, taken upon the *ex parte* statements, representations and solicitations of sympathizing friends and interested and uninformed parties, and cannot be said to prove anything except its own existence and the fact that the party was entitled to have or had the influence requisite to procure the application of the executive clemency to this case. A pardon does not profess to be a reversal of the judgment of conviction, but only relief from the punishment imposed by it. In every other respect the judgment stands as if no pardon had been granted.' This statement is certainly in sharp contrast with the opinions heretofore noted from the United States Supreme Court and does not fit as well with our notion of official duty performed by the executive as another found to have been quoted from 1 Starkie's Ev., 7th Am. Ed. 99, in the case of *Bennett* v. *State*, 24 Tex. App. 73 [5 Am. St. Rep. 875, 5 S. W. 527], 'And, although a pardon cannot convert a wicked man into an honest one, and confer credibility upon one who through the infamy of his conduct is not credible, yet such a pardon must be presumed to have been conferred after inquiry, upon good and sufficient ground, on an object worthy of the indulgence, and therefore worthy of being heard, but the degree of credit is still to be left to the jury.'

"From this rather lengthy *résumé* of the authorities it is apparent that sound reason and a proper sense of justice dictate that the jury should be left to determine the credibility of the witness after having laid before it the pardon. That while the subject of the wrongful conviction, if such in fact it was, may not be inquired into because that would require a lengthy examination into collateral matters, nevertheless the pardon is a proper subject of evidence.

"We have examined the other assignments of error but find nothing requiring further comment other than to say that the instruction in substance that the presumption

of innocence continues with the defendant through the trial and the deliberations of the jury, should always be given. (*People* v. *Ye Foo*, 4 Cal. App. 730 [89 Pac. 450].)''

Judgment and order reversed.