[Crim. No. 739.    Fourth Dist.    Jan. 9, 1951.]

THE PEOPLE, Respondent, v. JOE MICELI, Appellant.

Kahn & Block, Clifford K. Fitzgerald and Henry F. Walker for Appellant.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of one Kenneth Dick. On a second trial, he was found guilty of murder in the second degree and he appeals from the judgment and from an order denying his motion for a new trial.

The defendant was the proprietor of the 345 Club in El Cajon. About 1:30 a. m. on November 2, 1949, he got into an argument with his bartender, a man named Quinn. A customer at the bar complained of defendant's language because women were present. The defendant became angry and rushed at the customer. The decedent grabbed and held the defendant and a deputy sheriff, Hansen, left his table and assisted in quieting the disturbance. Shortly after Hansen returned to his table he saw the defendant slap Quinn's face. Hansen went over and took the defendant into an adjoining office

where he tried to calm him. They both returned to the bar-room in a few minutes and Hansen went to his table. Hansen then heard a noise and saw the defendant and Dick grappling and falling over a chair. Hansen went over and saw the defendant with his head and shoulders on the floor and his feet and the lower portion of his body over the chair. Dick was on top of defendant, holding his wrists, and there was a knife in the defendant's right hand. Hansen separated the parties and took the knife, the blade of which opened with a push button. Hansen closed the blade of the knife and handed it to a bystander, telling him to take care of it before the defendant hurt somebody. Hansen did not then realize that Dick had been stabbed. Dick was taken by other parties to a service station across the street. A little later, officers took him to a hospital where he died a day or two later.

 A number of witnesses who were present testified as to what they saw and heard. Some saw one thing and some another, and it would serve no useful purpose to fully summarize all of the evidence here. When Dick got up off the floor he said he was hurt and several witnesses saw the blood. One witness saw a ¾-inch wound near the left nipple on Dick's chest. When the defendant got up he told someone to call an ambulance, and said he would pay for it. The witness Vorce testified that after Hansen took the defendant into the office he saw the defendant come out rather fast; that the defendant moved toward Quinn yelling ''I will get you Earl, you bastard''; that Dick told the defendant to ''knock it off'' whereupon the defendant told Dick to get out of the way and stabbed Dick with his right hand; that he saw the defendant stab Dick by thrusting his hand forward and upward toward Dick's breast; that he saw the knife blade but not the handle; that Dick grabbed the defendant with both arms around his shoulders and they fell among the tables and chairs; that as they fell Dick said ''Why did you do it Joe. I am your friend''; and that Hansen came over and separated them. On cross-examination he admitted that at the prior trial he had not referred to this as a knife but as a ''shiny metallic looking object'' in appellant's hand.

Shortly after the incident the defendant told an officer, in reply to a question as to what had happened, that a stranger had come in and wanted a drink after 2 o'clock and there had been trouble but did not explain what the trouble was. While being taken to the jail he said he was very worried about what had happened and that he would like to get out of El Cajon

and out of California as well. The officers were unable to locate the knife which had been taken from the defendant, but one was introduced in evidence which the defendant said was exactly similar to the one he had had. There was evidence that Dick was a much larger man than the defendant. Blood was found on the floor of the barroom, on the chair over which the parties had fallen, and on the sidewalk in front of the premises. There was evidence that one of Dick's arteries had been cut by a sharp instrument, that there had been an unusual amount of internal bleeding, and that death was caused by this wound.

The defendant testified that while he and Quinn were arguing and "cussing" each other a customer remonstrated; that he then saw a lady with the customer and went over to apologize; that Hansen stepped between them and Dick put his hand on his shoulder and asked him to have a drink; that he and Dick went back to the bar; that he saw Quinn coming out from behind the bar and after some talk he slapped Quinn; that someone grabbed him and pushed him into Hansen's arms; that Hansen took him into the office where they remained a few minutes; that he never saw Quinn again that night; that when he and Hansen came out of the office Hansen went toward his table and he went toward the check room; that he saw Dick standing near the check room talking to two ladies; that Dick's back was toward him; and that he did not see or yell at Quinn. He then testified as follows:

"As I reached Kenny, I hit or slapped him on the backside with the back of my right hand to attract his attention and said 'Good night, Kenny'. He whirled around to his left, grabbed at me and we fell into the tables and chairs with Kenny on top of me. I thought he was playing or joking. But his hands were on my neck and he began choking me hard. I reached up and tried to pull his hands away but couldn't. I was unable to breathe. I had never seen Kenny act that way before. It frightened me. He was choking hard and I was afraid he was going to kill me. When I couldn't loosen his hands from my neck, I reached into my pocket, pulled out the knife, pushed the button and opened it. I had not had it in my hands before. I swung at Kenny, intending to hit him on the arm so as to loosen his choking hands. I don't know if I hit him. I remember nothing from that time until I found myself in the office with Officer Benson."

The defendant also testified that the next morning while shaving he saw bluish marks on his throat, that his throat

hurt and that it was difficult to breathe. He produced a doctor who testified that on that day he treated the defendant for this condition.

No question is raised as to the sufficiency of the evidence. It conclusively appears that the defendant stabbed Dick with his knife and that this caused Dick's death. The evidence strongly indicates that this stab was inflicted when the defendant first approached and struck Dick, and not during the struggle on the floor. It is not surprising that the jury did not accept the defendant's story. It seems incredible that during this brief struggle, with a large man on top of him, the defendant could have reached in his pocket, taken out and opened his knife, and inflicted this wound. The whole thing happened very quickly, with six or eight persons around, and just after they fell over a chair Dick was seen holding both of defendant's wrists.

It is first contended that the court erred in limiting the cross-examination of the witness Vorce with respect to his motive or bias. This witness was asked in several questions whether it was not true that he had been charged with forced rape, that the complaint was later dismissed by the district attorney, and that the statute of limitations had not run. Objections to these questions were sustained and error is assigned, citing *People* v. *Pantages,* 212 Cal. 237 [297 P. 890] and *People* v. *DeMello,* 28 Cal.App.2d 281 [82 P.2d 457]. In the Pantages case criminal proceedings were still pending, and in the DeMello case the conditions of an order granting probation were held material. In the instant case, the witness was allowed to answer several questions as to whether he had since the beginning of this case been in fear of the district attorney's office, or whether he was under any fear or any influence in testifying in this case, to which he answered in the negative. He was also allowed to answer the question "Are you under the impression that the District Attorney's office of this county will do something for you if you testify favorably to the prosecution?" He replied "As far as I am concerned the District Attorney's office will do nothing favorable or unfavorable against me regardless of which way I testify. The charge against me previous was dropped because I wasn't guilty, does that answer your question?" Defendant's counsel replied "Yes." By his equivocal answer to one question, the witness indicated that he had told defendant's counsel something to the effect that, because of the rape charge, he did not want to antagonize anybody. Some of the

questions called for conclusions as to whether the statute had run against the other charge, and no attempt was made to bring out the facts in that regard by proper evidence. The purpose of showing bias would not have been aided had answers to the rejected questions been allowed, and neither abuse of discretion nor prejudice appears.

■ It is next contended that the court erred in refusing to permit impeachment of the witness Vorce by reading from his testimony at the preliminary examination. This witness testified that he saw the defendant stab Dick with a knife and that he did not see the handle but saw the knife blade. He admitted that at the former trial he had not referred to this as a knife but as a "shiny metallic object" which he saw in defendant's hand. When asked at this trial "Now, you didn't actually see a knife or blade, did you?" he replied "To me it was a knife. In my own mind it was a knife." For impeachment purposes it was brought out that at the former trial the witness had referred to the object in the defendant's hand as a "shiny metallic object"; that in reply to a question he had stated that he could not be positive that it was actually a knife; and that when asked "Didn't you just get through saying so" he replied "Well, to me it was a knife." Counsel then desired to read a portion of his testimony at the preliminary hearing and permission was refused. This was cumulative, added nothing to any impeaching effect of the evidence already received, and neither error nor prejudice appears.

■ It is next contended that the court erred in giving one instruction and refusing another on the law of self-defense. The court gave a long instruction completely covering the matter of self-defense, in general, in which the applicable portions of section 197 of the Penal Code were given, and later repeated, in the language of the statute. The court refused to give an instruction asked for by the defendant purportedly based on a portion of the opinion in *People* v. *Hecker*, 109 Cal. 451 [42 P. 307, 30 L.R.A. 403], which would have told the jury that if it believed that the defendant was the first wrongdoer (in slapping or poking the deceased) this was merely a simple assault, and if Dick met this assault with a deadly counterattack the defendant had an absolute right to kill him, and the jury must find him not guilty. This instruction, as requested, was plainly erroneous. It is argued that the court should have given a correct instruction on its own motion to the effect that where the original assault was not felonious, and the counterassault was so sudden and perilous as to give

the first assailant no opportunity to decline the struggle, he would be justified in slaying forthwith in self-defense. Also, that the instruction given by the court was erroneous because it told the jury that if the defendant was the assailant and engaged in mutual combat he must in good faith have endeavored to decline any further struggle. The instruction as given included the exact language of the statute, and was broad enough to cover the basic idea contended for by the defendant. The jury having been properly instructed on the law of self-defense, in the language of the code, the defendant should have proposed any amplification desired in a form that could be given. (*People* v. *Dobbins*, 138 Cal. 694 [72 P. 339].) Moreover, the situation did not require a further instruction of this nature. The defendant testified that he merely hit or slapped Dick on the back to attract his attention while saying good night. He still insists in his brief that he was not the original assailant or aggressor and that he merely gave Dick ''a friendly tap in passing.'' We find no error in this connection.

■ It is next contended that the court erred in giving further instructions to the jury, at its request, concerning malice in relation to murder. In its original instructions the court had defined murder in both degrees and manslaughter, and had defined malice by reading section 188 of the Penal Code. After retiring for deliberation the jury returned and asked for ''any additional enlargement you can give on the definition of malice, of murder in the second degree, and of manslaughter.'' The court properly defined murder in the second degree, and then stated that malice, as it particularly applies to murder, is defined by the Penal Code in the language of section 188, which he again read. He then stated that the best explanation he could make was that malice is how a person feels toward another, a feeling of hatred or desire to injure another. He then explained the difference between express and implied malice as given in section 188, and said that he did not know how to explain it more fully than that. A juror then asked for the dictionary definition of malice. The court read a dictionary definition and then said that he would turn to the legal meaning of the word. He then read the first paragraph on page 338 of *People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53], and the definition of malice given in Bouvier's Law Dictionary. He then inquired whether this covered all the jury had in mind, and the foreman replied that it did. The jury retired and returned shortly thereafter with a verdict.

The defendant argues that the court should have confined itself to the language of section 188, and that it erred in giving further definitions and particularly in reading a portion of *People* v. *Wells* since the portion read included the definition of malice as given in section 7 of the Penal Code, and since that case was not concerned with the crime of murder but with the crime covered by section 4500 of the Penal Code. Section 4500 involves "malice aforethought," as does the crime of murder, and we are unable to see any error or prejudice in reading the excerpt from *People* v. *Wells* under these circumstances. It is further argued in this connection that the court thus erred in instructing the jury that a malicious intent is presumed from the deliberate commission of an unlawful act for the purpose of injuring another. This was not given as a separate instruction in this case but appears only in the portion of the opinion from *People* v. *Wells* which was read. While a dictionary definition was read this was distinguished from the legal definition of malice, and the language of section 188 was repeated several times. No simple definition of malice aforethought has ever been formed, so far as we are aware, and in our opinion the court covered the matter about as accurately and as fully as could well be done. There is nothing to indicate that the jury was misled in any way and we are unable to see anything in the matter which indicates prejudicial error.

It is next contended that the court erred in giving and refusing instructions with respect to the effect of impeachment by showing prior convictions. The defendant took the stand and it was shown that he had previously been twice convicted of felony. In referring to this evidence one of the instructions stated that it was not received as tending to prove the defendant's guilt of this offense, that it was to be considered only in weighing the credibility or weight of his testimony, and that it was not to be considered evidence of guilt in this particular case. The court refused, as covered, an instruction requested by the defendant stating that the fact that the witness had been convicted of a felony is simply one of the circumstances to be taken into consideration in weighing his testimony, and that such fact does not necessarily destroy or impair the witness' credibility and does not raise a presumption that he has testified falsely. It is argued that the instruction as given by the court is subject to the same criticism as the one given in *People* v. *Hardwick*, 204 Cal. 582 [269 P. 427, 59 A.L.R. 1480], where it was held that another

instruction, similar to the one here requested, should have been given. The instruction condemned in the Hardwick case informed the jury, in no uncertain terms, that such a witness was not entitled to the same credibility as one who had not been convicted. No such a situation here appears. Moreover, near the end of his instructions the court referred to the fact that the defendant had become a witness in his own behalf, and again instructed the jury: "It is your duty to weigh and consider his testimony in the same manner that you would weigh and consider the testimony of any other witness. You should not throw out, discard or discount it merely because he testifies, but you should take into consideration anything he has said . . . and then weigh and consider his evidence in the case as you would any other witness in the case." The matter was fully covered and no error appears.

Finally, it is contended that the court erroneously applied incorrect principles in determining the defendant's motion for a new trial. This is based upon the following language used by the court:

"I don't deem it my duty to absolutely disregard the verdict of the jury. I deem it my duty to give the evidence an independent review of my own, which I have done, and unless I am convinced that the jury is wrong, I should let their verdict stand. That is the rule which I have followed, the true rule which I believe is supported by the cases. Otherwise, you wouldn't have a jury. That rule is expressed in the case of Green against Soule. Mr. Kahn has the citation, about 141 Cal., substantially as I have stated it. So I think it is my duty and I am thoroughly justified and I should deny the motion for new trial. That will be the order of the court." This statement was made at the conclusion of the court's remarks which take up 12 pages of the transcript. The court had previously reviewed the crucial evidence in the case, pointing out the incredible nature of defendant's story, that the jury had a right to believe that the defendant had a knife in his hand and was starting after someone with the knife before he encountered Dick, and that it was obvious that if Dick was holding the defendant's wrists he was not choking him. He then stated that Hansen had testified that Dick was holding the defendant's wrists on the floor and that he believed Hansen's testimony. The remarks above quoted then followed.

Beyond question, a defendant is entitled to the independent judgment of the trial judge in passing on a motion

for a new trial. (*People* v. *Sarazzawski*, 27 Cal.2d 7 [161 P.2d 934].) While the court's remarks disclose a recognition of the fact that the verdict of a jury is entitled to respect and should not be lightly set aside, they fall far short of the contention here made, that they show that the court failed to give that second decision on the weight of the evidence to which a defendant is entitled. In the language complained of the court stated that he deemed it his duty to give the evidence an independent review of his own, and that he had done this. The other portions of his remarks demonstrate that this was true.

After a careful review of the entire cause, including the evidence, we find no error which, in our opinion, has resulted in a miscarriage of justice.

The judgment and order appealed from are affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied January 23, 1951, and appellant's petition for a hearing by the Supreme Court was denied February 5, 1951.