[Crim. No. 1068.  First Appellate District, Division One.—January 18, 1924.]

## THE PEOPLE, Respondent, v. WILLIAM A. HIGHTOWER, Appellant.

[1] CRIMINAL LAW—MURDER—CIRCUMSTANTIAL EVIDENCE.—In a prosecution for murder, where the evidence is so convincing as to necessarily produce certainty and conviction, it matters not that it is of a circumstantial character, as it affords at least as satisfactory proof as if it were direct; and in this prosecution, the facts and circumstances showed guilt to a moral certainty and the evidence was so strong as to be less fallible than any result arrived at by direct evidence.

[2] ID. — RESTRICTION OF CROSS-EXAMINATION — DISCRETION. — In this prosecution for murder, the trial court did not commit an abuse of discretion in restricting the cross-examination by defendant's counsel of certain witnesses as to matters testified to by them on direct examination.

[3] ID.—QUALIFICATION OF EXPERT—REMARKS OF TRIAL COURT—MISCONDUCT.—In a prosecution for murder, reversible error may not be predicated upon the remarks of the trial judge with reference to the qualifications of one of the experts, where those remarks were made during cross-examination and after the witness had qualified and they merely referred to the qualification of the witness, which it was the duty of the court to pass upon, and not

to the weight of his evidence, and no objection to such remarks was made by counsel for defendant.

[4] ID.—MISCONDUCT OF JUROR—READING OF AFFIDAVIT BEFORE JURY —INSTRUCTIONS.—The rights of defendant were not affected by the action of the trial court in permitting the district attorney to read in the presence of the jury an affidavit relating to an an incident growing out of the act of one of defendant's counsel in driving one of the women members of the jury about town in his automobile during the course of the trial, and then declining to hear the attorney, where such attorney and juror were cited for contempt of court and were exonerated, and the jury were so advised and they were instructed not to permit the matter to enter into their consideration in determining the guilt or innocence of defendant, but to obliterate it entirely from their minds.

[5] ID. — CHARACTER WITNESSES — IMPROPER CROSS-EXAMINATION—INSTRUCTIONS.—Reversible error may not be predicated upon the alleged misconduct of the district attorney in asking an improper question in his cross-examination of a character witness for defendant, where defendant's objection to such question is sustained and the jury is instructed to pay no attention to it whatever.

[6] ID. — KNOWLEDGE OF CHARACTER WITNESSES—PROPER CROSS-EXAMINATION.—A character witness may be cross-examined as to his knowledge of reports or particular and specific charges of the commission of acts inconsistent with the character which he is called upon to prove.

APPEAL from a judgment of the Superior Court of San Mateo County. George H. Buck, Judge. Affirmed.

The facts are stated in the opinion of the court.

William F. Herron, E. J. Emmons, Albert Mansfield and W. W. Laidley for Appellant.

U. S. Webb, Attorney-General, and Wm. F. Cleary, Deputy Attorney-General, for Respondent.

TYLER, P. J.—Defendant was accused by information of the crime of murder. He was convicted and sentenced to life imprisonment. A motion for a new trial was made and denied, and this is an appeal from the order denying the motion and from the judgment.

It is not contended that the evidence is insufficient to convict, but it is claimed that it is of such a character as

to leave room for grave doubt as to the defendant's guilt, and this being so, that the errors complained of become important where they might be considered otherwise under section 4½ of article VI of the constitution in a case where they did not result in an unjust conviction.

The crime itself which gave occasion to this trial is of its nature the most horrid and atrocious that can well be conceived by the human mind, and words are inadequate to express in proper colors its barbarous enormity. Father Patrick Heslin, a man over sixty years of age, was the priest of Holy Angels parish at the town of Colma, San Mateo County. He resided at the parish house adjoining the church, which is a few hundred feet from the state highway, which forms the main thoroughfare of that little community. Miss Magdalena Wendell was Father Heslin's housekeeper. On the evening of August 2, 1921, at about 9 o'clock, while the priest was in his study, a Ford automobile stopped in front of the premises and the occupant of the machine rang the parish doorbell. Miss Wendell answered the call. She was confronted by a strange man wearing a slouch hat and large, dark-colored glasses. He inquired if the father was in and, on being informed that he was, the visitor expressed a desire to see him. He was invited to enter the house. This invitation he refused, giving as a reason that he was in a hurry. Father Heslin was then called by his housekeeper and he immediately came to the door, spoke a few words with the visitor, re-entered the house, went upstairs and a few moments later descended with his hat and his stole (a religious vestment). He carried with him a morocco-bound case containing the sacrament and holy oils for anointing the sick. Upon being asked by his housekeeper if it was a sick case he answered her in the affirmative. He then entered the church and shortly thereafter joined the visitor, who in the meantime had turned his machine around so that it pointed away from San Francisco and in the direction of Salada Beach, a small settlement some six miles distant, located close to the sea to the west. Father Heslin entered the machine, it was operated from the seat by the driver, indicating that it was equipped with a self-starter. The occupants then proceeded upon their journey and Father Heslin was never thereafter seen alive. The next morning, August 3d, the church bell failed to ring at the accustomed

hour and the housekeeper, upon making an investigation, discovered the edifice locked. Other circumstances aroused her suspicions, caused her to become apprehensive and she notified the authorities. The same morning at about 10 or 11 o'clock, and before Father Heslin's disappearance had become generally known, there was received at St. Mary's Cathedral, in San Francisco, a letter, dated August 3d. This letter was opened and it proved to be a lengthy anonymous document partly typed and partly written and in substance it contained the information that the writer had Father Heslin in a bootleg cellar. The sum of six thousand five hundred dollars was demanded in currency for his release. The letter also contained the information that the priest had been injured, was unconscious from brain pressure and it advised haste. It was suggested that the money be brought to the parish house where the priest had lived at 9 o'clock that evening, at which time and place, so it was stated, a messenger would furnish instructions. The letter contained certain threats as to what might happen in the event that the instructions were not followed and the money not forthcoming. Subsequent to the receipt of this letter various rewards were on the eighth day of August offered by the Roman Catholic Archbishop and public authorities for the return of Father Heslin, dead or alive. On the evening of August 10th, defendant appeared at the residence of the Archbishop in San Francisco for the stated purpose of registering for the offered reward. He claimed that he had a clue to the grave of the missing priest. At the very moment of his call an ''Examiner'' representative was admitted to the home of the Archbishop. Before an interview was accorded either visitor defendant entered into conversation with the newspaper representative concerning his supposed clue and informed him that the place was in the vicinity of Colma. Upon repeating this statement to the Archbishop defendant was advised to communicate with the police. He expressed his reluctance to do so, giving as his reasons that his right to the reward might be jeopardized, he fearing the police would claim it. He further stated that he had in mind the possibility that his clue might reveal a liquor cache, in which event he did not want the police to know anything about it, as he desired to give the liquor to the friend who gave him the information, as she was

engaged in that business. After this interview with the
Archbishop defendant agreed to accompany the newspaper-
man to the office of the "Examiner" where he imparted his
information to the city editor of the paper. His story, in
substance, was to the effect that he had met a woman of
the night life on the street who told him that one of her
patrons, while drunk, had stated to her that he had some-
thing valuable buried "in a cave" which was being guarded
by a man "cooking hot cakes." Defendant recalled, so he
stated, that there was an Albers flapjack flour sign just off
the road which ran between Colma and Salada Beach, having
a picture thereon depicting a man frying flapjacks. He
further stated that the following day he visited this place
and was attracted to a niche or cave in the cliff which was
near the sign; that he dug around in the sand until he ex-
tracted a piece of burlap covered with blood and had found
several discharged pistol cartridges near there. Several days
later he made another tour of inspection and by prodding
into the sand with a stick had turned up a piece of black
cloth, but had made no further investigation. Upon receiv-
ing this information the city editor telephoned the police.
Certain police officers and newspapermen made up a party
to investigate defendant's story. The party was led by him
to a spot which proved to be the priest's grave. The place
was a shelf or ledge some ten feet below the rim of the
cliff. The body of the priest was removed and the autopsy,
subsequently held, revealed that death had resulted from a
blow on the top of the head and two bullet wounds in the
side. It was the opinion of the autopsy surgeon that the
body had been dead for a week or more. The next day a
thorough search was made by the authorities in the vicinity
of Father Heslin's grave. There was there found several
articles which subsequently proved to be important. They
consisted of pieces of lumber which had a string or cord
tied about them. The string bore evidence of having been
cut with a knife. There was also imbedded in the sands
tent stakes and a cinch block used to tighten the guy ropes
of a tent. Following the finding of the body defendant was
detained for questioning. He repeated his story to the police
that a woman of the underworld, named Dolly Mason, had
informed him of a conversation which she had had with a
drunken foreigner and that acting on this information he

had made his discovery. On the night of the priest's disappearance defendant was living at a downtown hotel with a woman named Dorris Shirley, who had accompanied him to San Francisco from Salt Lake City. His room was visited and searched by the authorities and a tent with stakes and a cinch block were there found of the same make and similar in design to those found at the priest's grave. In the seams of the tent was sand and on the side thereof in large block letters was printed the word "Tuberculosis." Defendant admitted having printed the word upon the tent with his fountain pen, giving as a reason that prowlers would not bother him in his use of the same. The tent had attached to it, pieces of string which bore evidence of having been cut with a knife. Upon examination this string proved to be identical in material and structure with that tied around the planks found at the grave. Other articles found in the room consisted of an incomplete machine gun, defendant's own invention, and another of his inventions consisting of shotgun shells grouped together and described in the record as an infernal machine. This contrivance was wrapped in a piece of burlap covered with human blood. Defendant had had this contrivance buried in the vicinity of the priest's grave, so he stated, prior to the time he had located it, having taken it there to experiment with. He further stated he had brought the machine back to San Francisco wrapped in the bloody piece of burlap above referred to. Defendant was thereafter charged with the murder of Father Heslin. It was proved at the trial that he had been seen in the vicinity of Salada Beach prior to the time when the crime was committed and other evidence showed that he was familiar with the country. The niche where the body was found was about ten feet below the rim of the surface and in front thereof was a narrow ledge the overhang of which formed almost a perpendicular cliff which dropped off abruptly a considerable distance to the beach below. At the time defendant first led the authorities to the grave he showed his familiarity with the surroundings by immediately jumping down upon the narrow ledge and locating the exact position of the body, although the night was thick in darkness between Colma and the ocean by reason of a drizzling fog which prevented the searchers from seeing a few feet ahead. The party had no

artificial light except that furnished by matches which it was impossible to keep burning on account of the strong wind which was blowing, and no light was procured until after the body was found. It was proved that defendant had rented a self-starter Ford automobile on August 1, 1921, but had not used it except for a short period until August 2d. This machine was left by him in front of the premises of the owner some time after 11 o'clock of the evening of that day, the owner's place of business being then closed. In accounting for his whereabouts on the evening of the murder defendant stated to the authorities different stories on different occasions. He first claimed that he was driving the hired machine back and forth on the state highway between the towns of Colma and Redwood City for the purpose of meeting a stranger on a motorcycle to arrange with the stranger for the purchase of bootleg whisky. Again he stated that he was driving the machine with Dorris Shirley as a companion; that he had started about dusk and had gone to San Jose, and he entered into a detailed description of the trip and claimed that he had returned somewhere about midnight. It further appeared that defendant had met Dorris Shirley in Salt Lake City and that she had accompanied him to San Francisco, where they had lived together as man and wife in various hotels. She testified that while she had gone to dinner with defendant the early part of the evening of August 2d, she had left him immediately thereafter and had accompanied one Lee Putman to Pantages Theater, where she spent the entire evening, and that she was not with defendant on a trip to San Jose or to any other place. Defendant admitted that his statement that the Shirley woman had gone to San Jose with him was false in this particular, but he still maintained that the object of renting the machine was to meet a boot-legger and that he had driven the machine as far down the highway as Redwood City for that purpose. Defendant was questioned concerning a 45-caliber automatic pistol that he had purchased from a man in Nevada. He admitted that he had made the purchase but claimed that he had sold the same to a stranger in a park prior to the time the murder was committed. He also admitted he had pawned the holster of the weapon with three cartridges in it similar to those found at the priest's grave. In pawning this article

defendant gave the name of Davis. Other facts were proved at the trial. Experts in handwriting testified positively that the block letters contained in the ransom letter were written by defendant, and Marie Wendell, the housekeeper, positively identified defendant as the nocturnal visitor with whom the dead priest was last seen alive. When arrested a knife was found on defendant's person. A microsopical examination was made of it with the object of determining the purpose of its last use. Two photo-micrographs were also made and enlarged and they showed that attached to a nick in the blade were pieces of cotton fiber similar to and corresponding with the cord used on the tent. [1] Taking all these facts together we cannot agree with counsel for the defense that the case presents a situation where there is a grave doubt as to defendant's guilt. In our opinion the facts and circumstances show guilt to a moral certainty and the evidence is so strong as to be less fallible than any result arrived at by direct evidence. Where, as here, it is so convincing as to necessarily produce certainty and conviction, it matters not that it is of a circumstantial character, and indeed it affords at least as satisfactory proof as if it were direct. Evidence of facts that might have thrown light upon his acts is missing. The very existence of several persons, namely, Dolly Mason, the purchaser of the revolver from one Sairgrease, to whom defendant claims he loaned the tent, and the persons with whom he stated he used it in connection with a picnic are wholly unaccounted for, and, indeed, it would seem they are purely mythical. Other facts might be commented upon but we believe no useful purpose would be subserved thereby as no complaint is made as to the insufficiency of the evidence.

[2] As ground for reversal appellant first complains of misconduct on the part of the trial judge in restricting the cross-examination of the Putmans. The Putman woman, also known as Dorris Shirley, testified upon her direct examination that upon the evening of August 2, 1921, the date of the disappearance of the priest, she had ridden with defendant in the Ford machine down to Market Street and had dinner with him; that she left him on that street at about 7:30 P. M.; that she later met Putman, with whom she visited the Pantages Theater and that when she started home she looked at her watch and it was ten minutes of

eleven; that she undressed and went to bed and that some time later defendant arrived, but she could not fix the hour. Upon cross-examination she was asked how she fixed August 2d as the date on which she visited the theater with Putman and she answered that she met Putman on the first and went there with him the following evening. When asked how she knew it was the first of the month that she met Putman she answered, "By the date—by the calendar." The defense sought to pursue the inquiry further by testing her recollection as to her action upon the other dates, but it was manifest from her answers that she could throw no further light upon the subject and the court properly exercised its discretion in closing the inquiry. Lee Putman corroborated her with reference to the date of their visit to the theater and the trial court restricted his cross-examination concerning his occupation. This matter was also one for the proper exercise of the court's discretion. The same may be said with reference to the cross-examination of Marie Wendell, the housekeeper.

[3] As further ground for reversal appellant complains of certain remarks of the trial judge referring to the qualifications of one of the experts. The remarks were made during cross-examination and after the witness had qualified. In order to expedite the proceedings the court stated: "I assume, gentlemen, that considering the standing of this expert, it would be sufficient for him to say after a sufficient examination with these exemplars that have been admitted in evidence and the letter which was received at the cathedral, it would be sufficient for him to give his opinion as to the authorship of that letter and then stop and let the matter rest." And again, in reference to this same witness the court restated: "He has been an expert for more than a quarter of a century in my court. Of course if you think it essential you may proceed." We fail to see how these remarks affected the substantial rights of the defendant. They merely referred to the qualification of the witness, which it was the duty of the court to pass upon, and not to the weight of his evidence. Furthermore, no objection was made by counsel for the defendant to either of the remarks.

[4] It is also urged that the trial judge was likewise guilty of misconduct in permitting the district attorney to

read in the presence of the jury an affidavit concerning one of the women members thereof and one of defendant's counsel. The incident grew out of the act of the attorney driving the juror about town in his automobile during the course of the trial. Upon the conclusion of the reading of the affidavit the court declined to hear the attorney and cited both him and the juror for contempt of court. We fail to see how this incident affected the rights of the defendant. Both the attorney and the juror were subsequently exonerated, the jurors so advised and they were instructed not to permit the matter to enter into their consideration in determining the guilt or innocence of the defendant, but to obliterate it entirely from their minds.

[5] And finally it is claimed that the district attorney was guilty of misconduct. Defendant had produced certain character witnesses. One of these witnesses had testified that the reputation of defendant for peace and quiet was good when defendant had lived in Bakersfield. He was then asked by the district attorney if he did not know that defendant had been hired to construct a contrivance consisting of shotgun shells so arranged as to kill a Mexican when he crossed a certain path and that the Mexican was killed and buried by defendant. An objection to this line of examination was sustained and the jury was instructed to pay no attention to it whatever. [6] A character witness may be cross-examined as to his knowledge of reports of particular and specific charges of the commission of acts inconsistent with the character which he is called upon to prove, such questions go to the weight of his evidence. (Underhill on Criminal Evidence, 2d ed., 82.) There is nothing in the record to show that the district attorney did not act in good faith in asking the question. The question in our opinion was within the proper bounds of cross-examination. (*People* v. *Fodera,* 33 Cal. App. 8 [164 Pac. 22].) But even if it be assumed the question was improper, we do not think the asking of it in any manner prejudiced the substantial rights of the defendant, as an objection to it was sustained and the jury admonished to disregard it.

In conclusion it may be said that the record upon the whole shows that defendant was given a fair and impartial trial, and the evidence of his guilt seems so clear and con-

vincing that one reading it cannot escape the conclusion that he has been very leniently dealt with. There certainly has been no miscarriage of justice so far as he is concerned.

The judgment and order are affirmed.

St. Sure, J., and Short, J., *pro tem.*, concurred.