[Crim. No. 3914. In Bank.—December 31, 1935.]

THE PEOPLE, Respondent, v. CHARLES P. STEVENS, Appellant.

E. G. Haumesch and Anna Zacsek for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

SHENK, J.—The defendant was charged by indictment with the murder of Mike Mucich in Los Angeles County on August 6, 1921. On a plea of not guilty, the jury returned a verdict of murder in the first degree without recommendation. The defendant has appealed from the judgment and from the order denying his motion for a new trial.

On the morning of August 7, 1921, the lifeless body of Mike Mucich was found lying on the south side of the road on the west approach of East Ninth Street to the Ninth-Street bridge in Los Angeles. He had come to his death by reason of one of two bullet wounds in his head, either of which would have been fatal. One of the bullets had entered the left cheek four inches in front of the external opening of the ear and had penetrated the base and other lower portions of the brain, pursuing an upward course of about forty-five degrees. There were powder marks about the entrance wound. The other bullet entered just back of the middle part of the left ear, passed slightly upward toward the left side and also penetrated the brain. One bullet was recovered and was shown to have been shot from a .38-caliber revolver. The body was found on its back with the head toward the west and downhill. Blood marked the face and the shirt worn by the deceased, and blood had run from the head on the ground for a distance of two or three feet.

During the night of August 6, 1921, about midnight, a switch-tender of the Santa Fe Railroad Company heard a model T Ford going east on Ninth Street. It passed within twenty-five or thirty feet of his shanty. The car stopped, he heard two shots fired, and the automobile was then started up and driven away. On the following morning about . 6 o'clock the same witness discovered the body lying about fifty yards distant from the switch shanty. Officers of the Los Angeles police department shortly thereafter arrived to make their investigation.

The defendant at that time was a member of the police department of the city of Los Angeles. At the time of the trial in June, 1935, he was forty-six years of age. He entered the police force in 1910, resigned in 1917 upon request, joined the army in 1918, was reinstated in the police department in 1919. He was discharged from the department for cause in December, 1921.

The defendant reported for duty on Sunday afternoon, August 7, 1921, and was interrogated with reference to his movements on the previous day. He made the statement then that he had been at the home of a Mrs. Minser (then Mrs. Schneider), in a company of friends who, about midnight, all repaired to a barbecue in Chatsworth Park, about forty miles distant; and that he drove Mrs. Minser and one Phil Stickel to the barbecue and returned to the city on Sunday morning to report for duty. An examination of his revolver showed that it had recently been fired and cleaned. The defendant maintained that he had used it in target practice. On the same afternoon he took the other officers to the barbecue which was still in progress. Members of the party who were questioned apparently satisfied the investigators that the defendant had been with them as he reported. No charge was made against him at that time, and except for the occasional accusations against him made by the decedent's brother, the investigation of the death of Mike Mucich was apparently dropped as one of the unsolvable mysteries.

In December, 1921, the defendant was discharged from the police department upon proved charges that he was intoxicated while on duty and for assault upon one Cates. A short time thereafter he moved to the rooming house conducted by Mrs. Minser. The defendant testified that they became intimate, bought a car together and that Mrs. Minser wanted to marry him. The defendant moved from Mrs. Minser's residence about a year later, following a noisy affray between them when the defendant was arrested. The defendant remained in Los Angeles County until 1927. On December 31, 1925, Mrs. Minser married Mr. Minser. Shortly after this marriage Mrs. Minser told her husband the story of the killing of Mike Mucich on the night of August 6, 1921, and in which the defendant and Phil Stickel were implicated. The Minsers separated in the latter part of 1929 and thereafter Minser reported the story to the police department. Mrs. Minser was arrested in March, 1930, and held as a material witness to testify before the grand jury, which returned an indictment charging the defendant and Phil Stickel with the murder of Mike Mucich. Stickel was arrested, tried and acquitted. The defendant Stevens was arraigned on the charge and pleaded not guilty. His trial commenced in June, 1935.

The story told on the stand by Mrs. Minser is substantially the following: On Saturday night, August 6, 1921, a number of persons gathered at her rooming house on Winston Street in Los Angeles preparatory to departing for a barbecue at Chatsworth Park. About eleven or half-past eleven that night Mrs. Minser came in with others from a fruitless attempt to obtain more wine for the party and saw the defendant at the head of the stairs talking to Phil Stickel. Mrs. Minser testified that she had been drinking and was "practically intoxicated". She heard Stickel protest to the defendant that he "did not want to go". She asked what it was all about and was told it was "about a fight or something". Mrs. Minser said she wanted to go. Stevens finally consented to take her along. The deceased, Mike Mucich, whom Mrs. Minser did not know and had never seen before, came up to them from the other end of the hall and all four of them, including Stickel, entered Stevens' model T Ford touring car. Stevens sat in the driver's seat, Stickel beside him, Mrs. Minser directly back of Stevens and Mucich on her right. Mucich was a tall, heavy man; Stickel was described as a "little" man. They drove toward Ninth and Santa Fe, a distance of about a mile and a half from Mrs. Minser's house. Mrs. Minser and Mucich were singing. As they approached the old Ninth-Street bridge, Stickel suddenly pointed his right arm out of the car and said, "Oh, look!" Mrs. Minser looked and immediately heard a revolver shot and saw Mucich's head drop forward on his chest. Stevens ordered Stickel to drag Mucich out of the car. Stickel, with some difficulty, pulled at the body which had slumped down on its knees toward the floor. She testified: "Stickel tried to pull him out . . . finally, I put my hands on him and tried to shove him, and he was dead weight. I took my hands off. I was dumfounded. Finally, I don't know how, but he and I had got to hauling and pulling him out, he got out of there and hauled him alongside of the road next to the machine." Then Stevens told Stickel to shoot him to make sure he was dead. Stickel fired a shot and then took his place again beside Stevens and they drove to the home of Mrs. Minser's parents where they cleaned the gun with kerosene and washed blood from the rear seat. Then they drove back to the rooming house and found no one, so they started for the barbecue. They stayed until about half-past seven in the morning when

Stevens told Mrs. Minser and Stickel that he had to drive back to town to report for duty. All three rode back together and stopped on the way and cleaned blood from the running board by rubbing it with weeds and sticks. Stevens let the other two out at the plaza and Stickel and Mrs. Minser hired another car and went back to the barbecue party. That afternoon about half-past one or two, as they were sitting down to eat, Stevens arrived with three officers and questioned the guests. Mrs. Minser testified that on that evening Stevens came to her house and stated to Stickel and her that he had been assigned to work on "his own case", and rehearsed with them as to what they were to do and say; that in this or a similar conversation he told her the reason he stood at the head of the stairs for some time on the night of the party was so people there would see him and remember him as having been there during the evening; that after Stevens moved to her house he threatened her life and pulled a gun on her several times, illustrating what he would do if she told what she knew, and that he broke mirrors and committed other acts of violence about the house.

The defendant testified that he had a short visit with Mucich about half-past eight on the night of August 6, 1921, at the latter's home, and then drove him at his request to a christening on Pleasant Avenue, but did not go into the house with him although Mucich wanted him to accompany him because someone had threatened him; that he left him about half-past ten and went to Mrs. Minser's house; that there were people there playing cards and otherwise engaged; that he called Phil Stickel, whom he had known for about two weeks, to the head of the stairs and asked him if he would go with him to buy more wine for the party but Stickel said he didn't want to go; then Mrs. Minser came up and he gave her the key to his car for the purpose of having someone else go for wine and that he then went into one of the bedrooms and slept for an hour or more; that about half-past twelve, Mrs. Minser came in and awakened him; that he put Mrs. Minser, who was intoxicated, in the rear seat of his car and went out and found Stickel; that the three drove out to Chatsworth Park, that he left the following morning about half-past seven with Mrs. Minser and Stickel and reported for duty; that they did not stop and clean blood from the running board; that there was no such trip to the Ninth-Street bridge as that

described by Mrs. Minser and that he had never shot at Mike Mucich. He also testified that in the course of his investigations concerning the death of Mike Mucich it was reported at the address on Pleasant Avenue that Mike Mucich arrived there alone the night before at about half-past ten and that he left there alone. Stevens admitted that among other firearms owned by him at that time he possessed a .38-caliber revolver. He denied that he had ever threatened Mrs. Minser.

Phil Stickel testified to much the same effect as Stevens, except that when Stevens proposed that they go for wine somewhere on his beat, and Stickel declined, Mrs. Minser offered to go with Stevens; that he, Stickel, left to attend to his lunch stand business in the neighborhood and that he closed his business and returned about half-past twelve and neither Stevens nor Mrs. Minser were there; that he met Stevens on the street about an hour later and that Stevens reported that he had been out getting some wine; that the three of them then went to the barbecue. He substantiates Mrs. Minser's account of the drive back to the barbecue on Sunday in a hired car.

■ It is unnecessary to add further to the statement of the facts. Sufficient has been stated to indicate that the question of the defendant's guilt was one to be resolved by the jury. The testimony of Mrs. Minser, corroborated to some extent by the testimony of the switch-tender and other evidence, supports the conclusion that Stevens was responsible for the taking of Mucich's life. If that testimony was believed, and it unquestionably was, there was but one inference to be drawn, namely, that the killing was premeditated and with malice. The question whether the crime could have been committed as related by Mrs. Minser, and the questions of the weight to be accorded the evidence and the credibility of the witnesses, were for the jury to determine. (*People* v. *Tedesco*, 1 Cal. (2d) 211, 219 [34 Pac. (2d) 467]; *People* v. *Bolton*, 215 Cal. 12 [8 Pac. (2d) 116]; *People* v. *Sieber*, 201 Cal. 341 [257 Pac. 64]; *People* v. *Buchanan*, 119 Cal. App. 523, 528 [6 Pac. (2d) 538].)

■ The defendant was represented at the trial by counsel other than those who represent him on this appeal. The first assignment of error is that the court should have declared a mistrial on the ground of the alleged gross and culpable incompetence of the attorney representing the defendant on the

trial, who was an attorney of the defendant's own choosing. If there was any error in this regard it was merely an error of judgment on the part of the defendant in the selection of counsel to represent him.

The appellant contends that there was a misstatement of the indictment to the jury, in that it omitted the name of Phil Stickel as a codefendant with Stevens. If there was such misstatement it was cured by a stipulation that the jury was amply informed of the nature of the charge and the defendant's plea.

Prejudicial error is assigned by reason of the submission to the jury of a ballot covering the crime of manslaughter. If that was error, it was far from being prejudicial to the defendant. If the jury had returned such a verdict, the court would have been compelled to discharge the defendant because the prosecution for such crime, if committed by the defendant on the night in question, would have been barred by the statute of limitations. (*People* v. *Meyers*, 39 Cal. App. 244 [178 Pac. 965]; *People* v. *Miller*, 12 Cal. 291.)

On the trial, before the defendant took the stand, his counsel called witnesses to prove the defendant's reputation for peacefulness and for truth and veracity. On cross-examination these witnesses were questioned as to their knowledge of certain reported conduct of the defendant, for instance, whether they knew that the report was that he had been discharged from the police department for committing acts of unnecessary violence upon others; that he shot two or more bullets into the body of a colored woman after she had fallen; that it had been reported that he was intoxicated while on duty and had committed assaults on some twenty Mexicans, taking knives and other things of value from them; and that a newspaper had printed a report that C. P. Stevens, a former policeman, had run amuck and fired a dozen shots in a house on Olive Street and had driven men and women roomers into muddy streets in their night clothes. Objection to the cross-examination was overruled, and the rulings thereon are assigned as error. In the absence of a showing of bad faith on the part of the counsel for the prosecution, such cross-examination of witnesses testifying to the good reputation of the defendant for peacefulness, or truth and honesty, is permissible where such examination tends to

test the weight of the testimony of the witness given on direct examination, as where such reports charge the commission of acts inconsistent with the trait or character which the witness was called upon to prove. (*People* v. *Sieber*, 201 Cal. 341, 349 [257 Pac. 64]; *People* v. *Weber*, 139 Cal. 325, 342 [86 Pac. 671]; *People* v. *Perry*, 144 Cal. 748, 750 [78 Pac. 284]; *People* v. *Moran*, 144 Cal. 48, 62, 63 [77 Pac. 777]; *People* v. *Gordan*, 103 Cal. 568, 574 [37 Pac. 534]; *People* v. *Buchanan*, 119 Cal. App. 523 [6 Pac. (2d) 538]; *People* v. *Simons*, 70 Cal. App. 143 [232 Pac. 772]; *People* v. *Hightower*, 65 Cal. App. 331, 338 [224 Pac. 110]; *People* v. *Stennett*, 51 Cal. App. 370, 382–384 [197 Pac. 372]; *People* v. *Burke*, 18 Cal. App. 72, 88, 89 [122 Pac. 435].) It may be that upon request being made therefor the defendant would be entitled to an admonition by the court to the jury that questions concerning such reports are not proof of the facts therein contained, and are not to be considered as evidence; but in the absence of such request, and none was made, and without bad faith on the part of the district attorney, and the record reveals none, the defendant's rights have not been prejudiced. (*People* v. *Fodera*, 33 Cal. App. 8, 12 [164 Pac. 22].)

▇ The defendant predicates error upon the refusal of the court to permit the witness Stickel to explain his affirmative answer to the question whether he had ever been convicted of a felony. Reliance is placed on *People* v. *Hardwick*, 204 Cal. 582 [269 Pac. 427, 59 A. L. R. 1480]. The errors complained of in that case were not committed here and nothing occurred in the court's refusal to allow the explanation by the witness Stickel which was prejudicial to the defendant's rights.

An examination of the record discloses that the defendant was fairly tried and that no prejudicial error was committed by the trial court.

The judgment and the order denying the defendant's motion for a new trial are, and each is, affirmed.

Thompson, J., Curtis, J., Seawell, J., and Conrey, J., concurred.

LANGDON, J., Dissenting.—I dissent.

Although there is evidence in the record, as stated in the majority opinion, sufficient to sustain the conviction, that evi-

dence is of such a nature that it does not warrant the imposition of the death penalty. The murder of which appellant stands convicted was committed in 1921. At that time the police investigated appellant because he had admittedly been with the deceased early on the night of the murder. The story appellant told to the police at that time was carefully checked by the police, and various witnesses, not now available, who saw appellant that night, were interrogated. The stories told by these witnesses tallied with that told by appellant and he was exonerated.

The only witness who testified to facts connecting appellant with the crime was Addie Minser. By her own testimony, she admits that she was very intoxicated at the time she was supposed to have observed the facts to which she testified. She is supposed to have first told the story about the killing to her then husband some five years after the occurrence of the events. Neither she nor Mr. Minser repeated the story until 1930. At that time, Minser had a fight with his wife, separated from her, and carried the tale to the police. Mrs. Minser was arrested and, after a few days in jail, recounted the tale implicating appellant and one Stickel. These two men were jointly indicted. Stickel was tried first and acquitted. It is quite significant that even if Mrs. Minser's story of the automobile ride be believed, that story makes Stickel the killer, not appellant. Although Mrs. Minser testified that she was sitting in the automobile directly behind appellant, who was driving, she testified that she did not see Stevens fire the shot, nor did she see a gun in his possession. She saw no flash, nor did she smell powder. If her story is true, Stickel must have been the murderer, not Stevens, but Stickel has been acquitted. If her story is true, the back seat and running board of the automobile must have been so saturated with blood that the cursory cleaning testified to by her could not possibly have removed the traces of the murder, yet the police examined the car the very next morning and found nothing suspicious. It is solely upon the testimony of this woman, who was admittedly "very drunk" at the time; who subsequently became very angry at Stevens because he would not marry her; and who did not tell the story to any one for five years, that this conviction is based. There is no other substantial evidence, direct or circumstantial, implicating appellant. No motive

was shown. No premeditation was shown. No concert of action between Stickel and appellant was shown. All the witnesses, including Mrs. Minser, concede that Stevens was not drunk. No prior argument or disagreement of any proportions between the decedent and appellant or Stickel was shown. While it must be conceded that Mrs. Minser's story supports the conviction and that the jury is the sole judge of the credibility of witnesses, the story told by Mrs. Minser is so fantastic as to tax my credulity.

Under such circumstances, any errors in the course of the trial warrant a reversal. The record in this case indicates that appellant was represented at the trial by an attorney (not appellant's present counsel), whose presentation of appellant's defense was wholly inadequate. After Mrs. Minser had been called by the People as the prosecution's chief witness and had been cross-examined by appellant's attorney, and after the prosecution had closed its case, appellant's then attorney called Mrs. Minser as his own witness, thus vouching for her, and had her repeat the entire story of that fatal ride. Counsel offered evidence of appellant's reputation for peace and quiet and for veracity. The prosecuting attorney did not object to any of this evidence and, although the trial judge, on the motion for a new trial, conceded that much of this testimony was inadmissible, he permitted it to come in because no objection was made. The prosecuting attorney was then permitted to introduce considerable evidence to rebut this inadmissible evidence. Over objection, newspaper articles concerning appellant, and highly damaging to him, were read to the jury, and the prosecuting officer was permitted to produce and read an affidavit filed with the police concerning appellant and charging him with brutality, robbery and other offenses, without any proof of the truth of such charges. On the motion for a new trial, new counsel having been substituted, the trial judge conceded that appellant was not properly represented and stated that he was not entirely satisfied with the case. He further stated that, in the event of an affirmance, ''I will then immediately go to the Governor personally, and I will lay all these facts before the Governor, and ask him to commute it from death to life imprisonment.''

Under the circumstances of this case, it would seem that a new trial should have been granted, or the trial judge should

have exercised the power conferred upon him by section 1181 of the Penal Code and modified the judgment.

Waste, C. J., concurred.

Rehearing denied. Waste, C. J., and Langdon, J., voted for a rehearing.