[Crim. No. 8155. Second Dist., Div. Four. Feb. 19, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JEREMIAH WILLIAMSON MOORE, Defendant and Appellant.

162

Crispus A. Wright for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and N. Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, P. J.—In an information filed by the District Attorney of Los Angeles County defendant was charged with four counts of abortion in violation of section 274 of the Penal Code. Defendant's motion pursuant to section 995 of the Penal Code was denied as to each count. Trial was by jury and defendant was found guilty on all counts. His motion for a new trial was denied, proceedings were suspended, and defendant was granted probation. This is an appeal from the judgment and denial of motion for new trial. No judgment has been entered or sentence pronounced but the order granting probation is deemed to be a final judgment for the purposes of appeal. (Pen. Code, § 1237.) The order denying the motion for new trial is not appealable.

It is unnecessary to particularize with respect to the evidentiary facts in each case. The record supplies substantial support for the verdicts rendered. It established that defendant procured the miscarriage of a Mrs. Evelyn Batties, a housewife, twice, as was charged in counts I and II of the information; of an Allie "Azalea" Watkins, as set forth in count III; and of a Mrs. Evelyn Ganey as charged in count IV. The procedure utilized by defendant in each case followed the same pattern. After contact by a prospective patient by referral through another patient, a preliminary examination was conducted, a fee was quoted by defendant and a time set for treatment. The fee in its entirety, or a substantial part thereof, was paid on the day of treatment. The fees charged were $225 (count I), $175 (count II), $200 to $300 (count III), and $250 (count IV). The patient was requested to sign, and in each instance did sign, a statement indicating the ostensible purpose of the treatment to be the correction of irregularity in menstruation, and stating that nothing was done by the patient or anyone else to cause the occurrence of this condition. The treatment, conducted by instruments inserted through the vagina, then followed, after which the patient was given a prescription and advised to report her condition. Defendant informed the patients involved in counts III and IV, prior to the commencement of the treatment, that he was about to insert some foreign matter into the uterus, and that as a result the bodily reaction would bring about a miscarriage.

Several days after defendant's treatment of Mrs. Batties on November 3, 1960, she passed a fetus and was cramping and bleeding heavily. Her husband took her to the U.C.L.A. Medical Center. Based upon his examination and the history that he had received, the doctor diagnosed her condition as a septic abortion.

While at U.C.L.A. Medical Center Mrs. Batties was interviewed by an investigator from the State Board of Medical Examiners ("Board"). At the instigation of the latter, one Mrs. Doris Trent (whose true name was Mrs. Doris Terminel), a part-time employee for the Board, went to defendant's office on November 17, 1960. She informed defendant that she had a problem and wondered if defendant could help her. Defendant asked her how long it had been since her last period and she told him it had been at least two months. He then asked who had sent her and she said Evelyn Batties. Defend-

ant told her that she would have to come in with Mrs. Batties so he could take care of her and for Mrs. Batties to call him.

On November 21 Mrs. Batties went to the Pasadena Police Station where she telephoned defendant. She told him she was sorry she had not come back for a checkup but that she hadn't been able to leave her children and she had sent a girl friend by the name of Doris Trent to see him. Defendant said he had seen Doris Trent but he had a feeling about her and wanted Mrs. Batties to come in with her. On November 22 Mrs. Trent went to defendant's office accompanied by Mrs. Batties. Mrs. Trent carried a miniature radio transmitter in her purse. Two investigators for the Board were in a panel truck parked across the street from defendant's office. They listened to what was happening by means of a receiving unit. They had given Mrs. Trent $300 and Mrs. Batties $75 in marked money. Mrs. Batties gave defendant the $75 which she owed him and introduced Mrs. Trent.

In response to defendant's inquiry, Mrs. Trent testified she told him that she had four children; that her menstrual periods had been very regular prior to the last period which she had missed and that she felt that she was pregnant. Defendant asked Mrs. Trent to sign a form which he said he always had women sign when they came to see him for that sort of thing. He asked her if she had ever had an abortion before and she said no. Mrs. Trent signed the statement. It was similar to the ones Mrs. Batties and the others had signed.

Mrs. Trent stated she asked defendant what the operation would cost and he said $250. Mrs. Trent gave him $260 and he returned her $10 in change and placed the rest of the money in his pocket. When the investigators heard this over the receiving unit they left the panel truck and with other officers went to the front and side doors of the building; they found the side door locked and broke the door to enter defendant's office. There they examined certain instruments and asked defendant what their purpose was. He stated that the cannulas were used in treatments for delayed menstruation. When asked if he intended to use either of them on Mrs. Trent he stated he intended to use one of them to insert glycerine. The investigator testified that defendant stated he usually used a rubber bulb over one end and would dip the other end which had two holes in it into the glycerine and then insert a small amount of the glycerine into the cervix to cause the dilation. Defendant stated that he had intended to treat Mrs. Trent for delayed menstruation as he had been told by

her she had missed her second period; that he usually injected prostigmin into the patient to cause a contraction of the uterus to bring about the menstrual period; that he used that procedure in conjunction with the injection of glycerine into the cervix; that he used this procedure on people who had missed three or more menstrual periods.

The investigator testified that when asked how much he charged Mrs. Trent for the proposed treatment defendant replied $250 which he handed to the investigator. The investigator observed that the bills bore the same serial numbers as had been recorded when the money had been given to Mrs. Trent. Defendant was asked if he had told Mrs. Trent that he guarantees his work to which he replied he told her if it didn't work he would give her money back.

Defendant was then taken to the police station. There he was asked if any of the patients whose names were read to him exhibited a medical history which would bring a conclusion in his mind that an abortion was necessary to preserve the patient's life. He answered in the negative.

A medical expert testified that the introduction of any foreign substance, particularly a fatty one such as glycerine, into the interior of a uterus that was six to eight weeks along in the process of pregnancy would tend to produce an abortion. He stated that the accepted practice in the community was to refrain from inserting any type of instrument in the uterus of any person who is six to eight weeks pregnant, and further testified that the insertion of a cannula into the uterus of such a person would cause an abortion and create a condition similar to that which he had observed upon his examination of Mrs. Batties on November 9.

A second expert, a specialist in obstetrics and gynecology, substantially supported the testimony of the first expert witness.

In his defense defendant produced a minister, three doctors, and an attorney who testified as to defendant's good reputation for truth, honesty, integrity, and high morals. A medical doctor was called to testify concerning the uses of drugs, progesterone, and ergotrate, prescribed by defendant for the women involved in counts I through IV. The former, he said, was used to enhance the condition of a patient to remain pregnant if the patient was pregnant and the latter to cause uterine contraction to prevent post partum hemorrhage or profuse bleeding. He was asked several hypothetical questions and in his answer to one such question he stated that

it would not be good medical practice to insert an instrument into the cervix of a patient who had not menstruated for two months. Defendant's counsel also stipulated that such an act would not be good medical practice.

Defendant testified in his own behalf. With reference to Mrs. Batties he acknowledged that he had treated her before her visit on February 26, 1960. He stated that on this latter date she had come to him for profuse and painful menstruation; that he gave her an examination and a shot of progestrone combined with ergotrate and penicillin; that he charged her $125 for the treatment which he asserted was to cover several other visits as well. He denied using any instruments on her or on any of the women involved in the other counts for the purpose of causing a miscarriage. He acknowledged treating Mrs. Batties again on November 3, but stated that on this occasion in addition to the treatment accorded her before he used a cannula to relieve a stenosis condition in her cervix. She paid him $100 at that time. He gave her some tablets for pain and a prescription for ergotrate.

With reference to Azalea, defendant said that she had given him a history of missing a menstrual period, spotting, and then having begun to flow profusely accompanied by pain in the lower abdomen. He gave her an injection and then used instruments and glycerine to relieve her bleeding condition. He stated she gave him $150.

Defendant stated that on October 7, 1960, he saw Mrs. Ganey; that Mrs. Batties was with her; that she complained that she had been spotting for over a period of two months and that her menstrual period had occurred very freely and profusely at the time of her visit. He stated that he gave her a pelvic examination and a shot similar to the one given to Azalea and Mrs. Batties. He stated that all three of the women had signed the form statement which he had prepared. He acknowledged that Mrs. Batties had paid him the $75 she owed him when she brought Mrs. Trent to the office; that he told Mrs. Trent the price would be $250 and that she paid it, counting it out in a loud voice.

On cross-examination defendant was shown his daybook in which the amounts of money paid by patients were recorded. The book reflected that on February 26, 1960, Mrs. Batties had paid $15 and owed a balance of $5. Defendant said to the best of his recollection she had paid him $125 on that day. He then said she had paid him only $100 and that she owed him $25; that the daybook was wrong in stating she only owed

him $5. He said that whatever amount she had paid she was entitled to treatments for several months which would have amounted to between 12 and 20 treatments. On the fifth time that she came back, which was November 3, 1960, defendant asked her for $175 at which time she paid $100, but defendant admitted he reported receiving only $20 in the daybook.

On appeal defendant contends that the evidence is legally insufficient to support his convictions on the four counts of abortion. It is elementary of course that the evidence must be viewed in the light most favorable to the prosecu- When viewed in this light there can be no question but what the evidence was sufficient to sustain the convictions. The fact that Mrs. Batties did not abort immediately following her visit on February 26 does not affect his conviction on count I. In situations where a defendant has made several attempts before securing an abortion he can be separately charged with abortion as to each attempt. The gist of the crime is not the actual consummation of an abortion but rather the performing of the acts prohibited by section 274 of the Penal Code with the intent to procure a miscarriage.

 It should be noted that as to counts III and IV that it was Mrs. Batties who took the women involved in those counts to defendant for the expressed purpose of getting him to help them terminate their pregnancies.

In support of his contention that the evidence was insufficient defendant refers to the case of *People* v. *Feigin*, 174 Cal.App.2d 553 [345 P.2d 273]. In the latter case one of the two counts upon which the defendant was convicted was reversed on appeal because there was no evidence of a substantial nature corroborative of the testimony of an accomplice who arranged for the victim's abortion, paid the doctor in question $300, and assisted him. Without corroboration his testimony was legally insufficient to prove commission of the offense and the court held that merely placing the woman upon a table in a position for a vaginal examination would not constitute an element of abortion. In that case the victim could not speak English and went to the doctor because the accomplice asked her to. She saw no money passed to defendant. She did not state to the doctor her reasons for believing herself to be pregnant. After having been given two injections and having been placed upon the table she became un-

conscious and consequently could not testify as to what was done to her. Thus, the court concluded her testimony did not furnish legal corroboration for that of the accomplice.

In the case before us Mrs. Batties told defendant she was two months pregnant and that she was desperate. She testified as to the use of instruments by defendant. This was likewise true with respect to count II. As to count III, both Mrs. Batties and Azalea told defendant that Azalea was approximately two months pregnant. In fact, Azalea advised the doctor of the test which had been made by her regular physician who told her that she was pregnant. She, too, testified to the use of the instruments. The facts are similar with respect to count IV. In both counts III and IV the women testified defendant told them that they were pregnant and that as a result of his treating them they would lose their babies. Further indication of defendant's belief that the women were in fact pregnant and of his intent to cause them to abort is seen from his conversation with Doris Trent in which just prior to starting to treat her he asked her if she had ever had an abortion before.

Defendant contends that there was no corroboration. In fact, however, the testimony of each of the women corroborated that of the others as to the substantially identical methods used by defendant. Additionally, defendant himself admitted treating all three of the women involved. While it is true that Mrs. Batties in effect was an accomplice of defendant in the commission of the abortions upon the two women whom she brought to defendant, neither she nor defendant was an accomplice of either of the other two women when they were aborted. The testimony of an accomplice of a person committing an abortion may be used to corroborate the testimony of the woman aborted, since the woman aborted is not an accomplice of the person committing the acts on her. (*People* v. *Kutz*, 187 Cal.App.2d 431, 437 [9 Cal.Rptr. 626].)

The falsification of the financial records of defendant for the obvious purpose of concealing the charges which he made for the services which he allegedly performed is further corroboration. Obviously, the charges which he imposed and collected in advance were clearly disproportionate to the treatments which he allegedly gave them, whereas the more normal charges shown in the entries in his daybook would have been proper. Defendant acknowledged, however, that even the entries did not conform to the amounts he actually received.

The preliminary arrangements for the treatment for

Doris Trent is further corroboration that defendant was accepting these unusually large sums for purposes other than his avowed purpose of treating these women for maladjustments in menstruation.

Defendant contends that it was error for the court to have permitted the introduction in evidence over his objection of a tape of portions of a conversation had by Doris Trent with defendant. The testimony shows that the Board's investigating officers attempted to record the entire conversation but due to mechanical malfunction the recorder did not get the entire conversation. Thus, only that portion of the conversation was introduced which was available. The Board's agents, however, at their post in the panel truck, heard the entire conversation at the time that it was being transmitted from the transmitter in Doris Trent's purse even though only portions of it were successfully taped. The unrecorded portions of the conversation were testified to by one of the Board's agents. This agent was available for cross-examination concerning the entire conversation and in fact was examined by defendant's counsel.

In *People* v. *Dupree,* 156 Cal.App.2d 60, 68 [319 P.2d 39], it was held that the fact that a recording may not be clear in its entirety does not of itself require its exclusion from evidence since a witness may testify to a part of a conversation if that is what he heard and if it appears to be intelligible. Likewise, any reference to the tape recording could have been avoided entirely and the testimony of the person who overheard the conversation could have been utilized exclusively. (*People* v. *Kulwin,* 102 Cal.App.2d 104, 109 [226 P.2d 672].)

Defendant contends that the court should have sustained his objection to the introduction of any evidence taken from defendant's office upon the ground that the evidence was obtained by and as a result of unlawful search and seizure. Defendant contends that the officers did not have reasonable grounds to believe a felony was being or about to be committed; that defendant had not asked Doris Trent to disrobe and that she had not gone into the treatment room prior to the time the officers broke down the door. Defendant relies upon the case of *People* v. *Schaumloffel,* 53 Cal.2d 96 [346 P.2d 393]. That case, however, dealt with a search which was deemed to have been wholly exploratory wherein the police sought evidence of the commission of crimes not connected with the charges under investigation prior to the defendant's

arrest. There can be no question but what the officers here had probable cause for defendant's arrest. In view of the information they had received from Mrs. Batties, the telephone call which they had heard between Mrs. Batties and defendant concerning the financial arrangements over her abortion and the conversation between defendant, Mrs. Batties, and Mrs. Trent which they overheard by means of the transmitter, whatever search was made was entirely incidental to a lawful arrest. (See *People* v. *Schmitt,* 155 Cal.App.2d 87, 101-103 [317 P.2d 673].)

Defendant contends that certain cross-examination by the prosecutor of defendant's character witnesses was improper and that the court erred in denying defendant's motion for a mistrial. The prosecutor asked two of defendant's character witnesses if they had heard that defendant performed abortions and was running a handbook on horses. Our courts have held that in the absence of a showing of bad faith on the part of counsel for the prosecution, a character witness may be examined as to reports charging the commission of acts inconsistent with the trait of character which the witness was called to prove. (*People* v. *Stevens,* 5 Cal.2d 92, 99-100 [53 P.2d 133].) It is asserted that in chambers the prosecutor made an offer concerning the propriety of the questions, his good faith, and authorities to support his position. This was done off the record. When the trial court finished hearing the argument it went back on the record to note that the case was very similar to the case of *People* v. *Thompson,* 69 Cal.App.2d 80, 93-94 [158 P.2d 213], and that it was therefore denying the motion for mistrial.

It is presumed that the prosecutor acted in good faith in the performance of his duties. (*People* v. *Cummings,* 141 Cal.App.2d 193, 200 [296 P.2d 610].) For this reason a showing of bad faith on the part of the prosecutor must be made by defendant. (*People* v. *Stevens, supra,* 5 Cal.2d 92, 99.) There is nothing in the record to show that these questions were asked in bad faith.

Defendant contends that statements of the deputy district attorney in his argument were clearly prejudicial. The transcript of the particular portion of his argument to which defendant objected reads: "Only you can protect him. Maybe you think he is doing good work out there. Maybe you think there are too many children. Maybe you think, particularly there are too many colored children and that they, and the United States Supreme Court are ganging up on you

and the doctor is doing the right thing.'' When defense counsel asked that the prosecutor be cited the court told the jury to disregard the last remarks of the prosecutor. We believe that any prejudicial effect which this argument could have had was certainly corrected by the court's admonition.

Other contentions by defendant do not require discussion. Defendant received a fair trial and was convicted upon substantial evidence. The order granting defendant probation is affirmed, and the purported appeal from the denial of the motion for new trial is dismissed.

Jefferson, J., and Bishop, J., pro tem.,* concurred.